(No. 22895.— ▮▮▮▮▮)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* EDWARD NEWMAN, Plaintiff in Error.

*Opinion filed April 17, 1935.*

LEAL W. REESE, D. W. JOHNSTON, and W. S. GREER, (GEORGE W. DOWELL, of counsel,) for plaintiff in error.

OTTO KERNER, Attorney General, JOHN W. COALE, State's Attorney, and J. J. NEIGER, (JOHN E. HOGAN, of counsel,) for the People.

Mr. JUSTICE STONE delivered the opinion of the court:

Plaintiff in error, on an indictment in the circuit court of Christian county for the murder of one Joe Agotis, was found guilty of manslaughter. He urges reversal of that judgment on the following grounds: (1) The court erred in giving to the jury an instruction defining manslaughter and a form of verdict based on that charge, for the reason that the accused was either guilty of murder or was innocent under his defense of self-defense; (2) the verdict is against the manifest weight of the evidence; (3) a new

trial should have been granted because of newly discovered evidence; (4) misconduct of the bailiff in charge of the jury; and (5) errors in receiving and rejecting testimony.

Plaintiff in error was twenty-six years of age at the time of the trial and lived in the city of Taylorville with his father and mother. He was a miner, though not at that time engaged in mining. The Newman home was on the north side of Prairie street, an east and west thoroughfare in the city of Taylorville. On the south side of Prairie street, slightly to the west of the Newman home, was the home of one Elliott. Directly south of the Elliott lot, and across the alley back of that lot, was the building in which the deceased lived. It was a single-room structure twenty feet east and west with a width of about eight feet. It stood back about two feet from the alley line and was surrounded by a picket fence. It was made of common lumber, unlined, with a door on the south side near the west end and two windows on the south side. There were no windows in the north side nor in the west end. It is characterized in the evidence as a "shack." On the lot next west from the Elliott home is the home of Joe Schwab, and next west of that the home of one Beaman. This latter lot abutted on Elevator street, a north and south street intersecting Prairie street. On the north side of Prairie street, on the third lot west from the Newman home, lives the sister of deceased, Marcella Kinder Stopelis, with her son, Bennie Kinder. The Elliott, Schwab and Beaman lots are 50 feet in width and 142 feet deep. On May 13, 1934, about 9:00 o'clock A. M., plaintiff in error, Geraldine Thompson and Joe Schwab were digging for fish worms in the north side of the alley, just west of the east line of the Schwab lot. Joe Schwab's wife was inside the Schwab lot leaning on the fence, watching them and facing south. While they were thus engaged Agotis came out of his shack, and, standing near his west fence, close to the southwest corner of his shack, swore at them, and pointing a revolver at them ordered them to get out of the

alley or he would kill them. Mrs. Schwab, observing his attitude, warned those in the alley of his presence just before he began swearing at them. As the three looked up Agotis fired at them. The bullet went through a picket in his north boundary fence and struck the ground a few inches in front of Geraldine Thompson, between her and plaintiff in error. The three in the alley then ran west to Elevator street, a distance of about 145 feet, thence north a distance of 142 feet to Prairie street, and east approximately 75 feet to the front of the Schwab house. Mrs. Schwab ran north in her lot to the front of the Schwab house. Mrs. Stopelis was in her garden, just across the street north, and was told of the occurrence by Mrs. Schwab. Plaintiff in error's mother came to the porch, and on hearing what Mrs. Schwab had said, fainted and was carried into her house. According to the testimony of witnesses for the defense, plaintiff in error and Schwab then went to the rear of the Schwab house. Schwab entered his basement by an outside entryway and plaintiff in error walked toward the back of the Schwab lot to a point where he had placed a lunch basket when they started digging for worms. The Schwab garage is along the east boundary line of that lot, a short distance back of the house. Plaintiff in error testified that after picking up the basket he started toward the garage to get some fish poles which he had placed there, when he saw Agotis standing about four feet west of the southwest corner of his shack, pointing a gun at him. He testified that Agotis fired two shots at him, whereupon he took out of the lunch basket a gun which he had put there to take with them on their fishing trip and fired seven shots at Agotis, and that Agotis dropped his hands and turned and disappeared around the corner of his house, and that that was the last he saw of him, and that plaintiff in error then went to his own home.

Mrs. Stopelis testified that with her son, Bennie, she went to the shack of her brother Agotis and found the

door locked. Shortly thereafter the sheriff, who had been called, came and forced the door. They found Agotis lying in the west end of the shack, near a cook stove, on which some meat was burning in a frying pan. The evidence showed that he had been shot three times. One bullet struck him in the shoulder, another in the chest and one in the abdomen. He died shortly after the officer found him and before medical assistance arrived. Other physical facts show that there were five bullet holes in the Agotis shack. Two were in the north side, near the northwest corner, and three were in the west end, near that corner. They ranged from three feet to four feet and three inches from the ground. On the south side of the structure were two bullet holes, one going through a window and the other going through the board wall. One of these holes was about three feet seven inches above the foundation line and seven feet four inches east of the west wall. The other was four feet three inches above the foundation and eight feet nine inches east of the west wall. It is conceded that these holes were made by the bullets fired into the north side of the shack. No marks of the other three bullets were found on walls of the shack. Agotis' gun was found in a hen's nest in the chicken house on his premises about ten feet east of the east end of his shack. The gun contained three empty shells and three loaded ones. The testimony is that one of the empty shells had not been fired recently but was gray and green inside, indicating exposure to the air for some period of time.

The defense was self-defense. Josephine Schwab, the daughter of Joe Schwab, testified for the accused that she was in the basement of her father's home and her attention was attracted by the first shot, and that when she looked out of the window she saw Agotis standing near his shack, her mother running toward her, and her father, Geraldine Thompson and plaintiff in error running west down the alley. A few minutes later, as her father entered the base-

ment, she saw plaintiff in error pick up the lunch basket near the fish pond; that Agotis was standing by his shack; that plaintiff in error walked southeast toward the garage, carrying the basket in one hand and a gun in the other, and that as he did so she saw Agotis fire twice at plaintiff in error. She testified that she ran up-stairs and through the house to the front porch, and while doing so she heard seven or eight shots fired in rapid succession. Joe Schwab testified that after he reached his basement he heard two groups of shots.

Mrs. Stopelis testified that after the first shot was fired, when plaintiff in error came to the front of the Schwab home he ran across the street into his own house and came out with a pistol in his hand; that she heard his mother imploring him not to go, saying, "Ed, don't do it;" that the witness came out of her garden and followed Newman and saw him fire a number of shots into the shack of Agotis while she implored him not to kill her brother, and that as soon as the shooting was over she went to the shack but could not gain admission because the door was hooked.

Plaintiff in error's testimony is, as other defense witnesses, concerning the firing of the first shot by Agotis and the flight from the alley. He testified that he fired seven shots after Agotis had fired twice at him. He testified that he knew he fired seven shots because the gun he had was an automatic pistol holding ten shots and just previous to that time was fully loaded, and he afterwards counted the loads remaining in the gun and knew he had shot seven times.

Counsel for plaintiff in error say as to the three shots fired through the west end of the shack, and which could not be further traced, that the door must have been open and these bullets went out through the open door. The People, on the other hand, say that these physical facts show that plaintiff in error fired into the building when Agotis was inside and he was thereby killed. They point

out that he had received three bullet wounds, and that as plaintiff in error positively testified that he fired but seven shots, five of which were known to go through the building, the deceased could not have received at least one of the shots inflicted upon him without being inside the building.

The evidence was in sharp dispute as to what occurred after the first shot fired by Agotis. Whether he fired again, and whether he was outside of the building when plaintiff in error fired seven shots in the direction of the shack, are matters as to which the evidence in the record is not in agreement. The court instructed the jury, over the objection of plaintiff in error's counsel, that under the indictment for murder in that case they might find plaintiff in error guilty of manslaughter, instructed as to the definition of manslaughter, and told them that if, after considering all the evidence and the court's instructions, they believed that the State had failed to prove the material allegations of the indictment beyond a reasonable doubt, yet if they believed beyond a reasonable doubt that the accused took the life of deceased under facts and circumstances not justified or excused by the law of self-defense but under a sudden heat of passion, caused by a provocation which was sufficient to make the passion irresistible, then the jury might find him guilty of manslaughter. A form of verdict finding the accused guilty of manslaughter was also submitted to the jury. The first contention we shall consider arises on this instruction.

Counsel for Newman urge that there was no evidence upon which to base a manslaughter instruction or verdict. This court has often announced the rule that where the evidence is such that it admits of but one of two conclusions, either that the defendant is guilty of murder or is innocent, the giving of an instruction and form of verdict on manslaughter is improper, and where given at the request of the People amounts to error requiring a reversal of the

judgment if the accused be found guilty of the lesser crime. (*People* v. *Pokosa,* 342 Ill. 404; *People* v. *Preston,* 341 id. 407; *People* v. *Hauke,* 335 id. 217; *People* v. *Moore,* 276 id. 392; *People* v. *Schultz,* 267 id. 147.) The rule often stated, and conceded by the People, is, that if a sufficient time has intervened between the provocation and the killing to permit the voice of reason to be heard the crime cannot be manslaughter but if any crime is committed it is murder. Counsel for the People argue that in this case but two or three minutes elapsed between the first shot fired by Agotis and the fatal shooting; that a serious assault had been made upon the plaintiff in error, his sweetheart, Geraldine Thompson, and others, and it could not be said as a matter of law that plaintiff in error had time to collect his reason, and that the question whether there was opportunity for the voice of reason to be heard was therefore a question of fact for the jury. We cannot agree with this view. After the first shot was fired all three of the persons in the alley, and Mrs. Schwab, who was in the yard, escaped to a safe place, out of range of the Agotis gun. Plaintiff in error deliberately returned to the back of Schwab's yard. His testimony is that he went to get the lunch basket and fish poles. If that be true, certainly he could not have been then under an irresistible passion. If he went into the back yard with the deliberate intention of shooting Agotis, as some of the testimony indicates, his acts must have been deliberate. If his motives were revenge, the fact that they were induced by the original shooting does not bring his acts within the definition of manslaughter. Regardless of what the evidence shows in that regard, (and we give no opinion on that matter,) it seems clear to us that there is in the record no evidence upon which a manslaughter verdict can be based. The giving of this instruction was error requiring reversal.

Conviction of manslaughter on a charge of murder amounts to an acquittal on the graver charge. (*People* v.

*Liddell,* 353 Ill. 201; *People* v. *Carrico,* 310 id. 543; *People* v. *Barnett,* 54 id. 325.) Plaintiff in error cannot be again tried on that charge, and, as there is no evidence of his guilt of manslaughter, the judgment of the circuit court of Christian county is reversed.

*Judgment reversed.*