**People of the State of Illinois, Plaintiff-Appellee, v. Jesse Pena, Defendant-Appellant.**

**Gen. No. 50,568.**

First District, First Division.

June 13, 1966.

Gerald W. Getty, Public Defender of Cook County, of Chicago (Marshall A. Patner, Frederick F. Cohn and James J. Doherty, Assistant Public Defenders, of counsel), for appellant.

Daniel P. Ward, State's Attorney of Cook County, of Chicago (Elmer C. Kissane, Joel Flaum and Robert A. Romanoff, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE MURPHY delivered the opinion of the court.

In a bench trial on a murder indictment, Jesse Pena, 17 years of age, was found guilty of voluntary manslaughter under section 9–2(b) of the Criminal Code (Ill Rev Stats 1965, c 38). He was sentenced to the penitentiary for a term of 5 to 15 years. On appeal, defendant contends that his conviction should be reversed because he acted in self-defense.

In summary, the record shows that two groups of boys were in a street altercation, and defendant shot and killed Dragan Petrovich, one of the group known as "Junior Spartans," and wounded another, Jesse Perez. It was stipulated that the cause of death of the deceased was a gunshot wound, and that no alcohol was found in the blood of the deceased.

Criminal Code provisions in point are:

"§ 9–2. Voluntary Manslaughter.] . . .

"(b) A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles

stated in Article 7 of this Code, but his belief is unreasonable."

and Article 7—Justifiable Use of Force; Exoneration, which provides:

"§ 7–1. Use of Force in Defense of Person.] A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony."

The evidence for the State included two eyewitnesses and a police officer.

The first witness for the State, Jesse Perez, 19 years of age, testified that on the evening of November 28, 1964, the "Junior Spartans," Dragan Petrovich, Jesse Perez, Angelo Flores, Salvadore Tinoco and a boy called "Cotton Head," had spent some time driving around in Petrovich's 1959 white Chevrolet. At about 11:45, they parked the car on 18th Street near Newberry Street. They got out and walked across the street toward a nearby restaurant. As they reached the other side of the street, they saw a group of boys, which included the defendant, Jesse Pena, Steven Tienda (Buzzy), Raymond Juarez, Robert Paloma and James Daniels. "Cotton Head" said something to "Buzzy," and Perez heard someone say, "Jesse, forget it." Perez then saw some boys running.

Perez further testified that he was standing quite close to defendant when he heard a shot. He felt blood on his neck and fell to the ground. "I kneel down and he

took another shot at me. That's when I saw the gun on him [Jesse Pena], . . . three feet away from me. . . . I just tried to get up and run. I couldn't run. He took another shot. He shot at me twice. After I got hit the first time he shot at me twice. . . . All I remember is somebody picked me up and took me in a squad car."

On cross-examination, Perez testified that he and the defendant were not exactly friendly but they had never had an argument. They had delivered papers together two or three years before. Perez dropped out of school when he was in the 8th grade.

The second witness for the State, Salvadore Tinoco, 17 years of age, knew the defendant, Jesse Pena, and the deceased, Dragan Petrovich. He had been in the car with Petrovich, Perez, Flores and "Cotton Head," and when they walked across the street, "Cotton said, 'I want to talk. I want to say something to Buzzy,' Steven Tienda. . . . So I turned around and I said, 'Forget it.' . . . Well, I heard a shot. I turned around. Jesse was going down, Jesse Perez. So I went towards Jesse. Pena, he shot again at Jesse. So then he turned around towards me and Dragan and pointed towards me. I dived. He took a shot. I don't know where he hit Dragan. So then he took another shot. I heard the other shot. Then he came towards me. I was on the ground. He shot. But I jumped up. He missed me. . . . Jesse Pena faced towards Dragan and shot again. Dragan was in the middle of the street, running into . . . the alley. He shot at Dragan. Then I picked up Jesse. I was running. I seen Dragan when he got hit again. I don't know if he hit him then. . . . Jesse Pena re-loaded and started shooting again." Tinoco heard the gun fired about twelve times. Before the gun was fired, he had no argument with Jesse Pena or anyone.

On cross-examination, he testified he had quit high school while in his first year and was working at the

308

time of the occurrence. He did not hear defendant say anything, nor Steven Tienda. "I didn't hear him say anything, . . . I didn't hear Cotton say anything," and when the witness said, "Forget it," he intended for "Cotton to forget what he was talking or saying."

The last witness for the State, Police Officer John Serafini, testified that he and defendant's father went to the home of defendant's brother, where they found defendant. "Jesse stated he had been involved in a fight with a couple of boys; that he shot two of them. I asked Jesse where the gun was. At first he said he had thrown the gun away immediately following the shooting, but a few minutes later he said, 'It's underneath the back porch,' " where it was found.

The evidence for the defense included the defendant and three eyewitnesses.

Defendant testified that earlier in the evening he had been to a party, and he left with Steven Tienda (Buzzy), Raymond Juarez, Robert Paloma, James Daniels and Sylvia Guerra. As they were walking down 18th Street, a white 1959 Chevrolet passed by. One of the boys in his group said, " 'There goes the Junior Spartans.' We said we might as well hurry up because they are always looking for trouble. . . . They were supposed to be looking for Steven Tienda and Raymond Juarez. . . . The car stopped, to cross the street. Jesse Perez and Dragan Petrovich and Salvadore Tinoco and "Cotton Head" and Butch Flores came out of the car. They came up to Buzzy. Cotton Head said, 'We have something to settle.' He hit Buzzy. Then Buzzy said he didn't want to have no quarrel. So Chava, Salvadore Tinoco, came and hit him and threw his cigarette in his face. He said, 'Let's get this over with.' They were swearing. . . . all the boys had their hands in their pockets and Buzzy was scared and so was I. And I pulled out the gun and said . . . 'Not so many of you on Buzzy. Leave him alone.' Jesse got around me. He was coming to jump

309

me from behind. I turned around and shot to the side. I didn't know I hit him. He kept on coming. Dragan and Salvadore and the other two boys were coming to the front of me. So I got scared. I shot up in the air and at the side of them. I didn't know I hit nobody because they all turned around and ran. That is when we ran, too." He did not intend to hit anyone and did not shoot at "anybody running away." He shot about five times and did not aim the pistol at anybody in particular and did not intend to hit Dragan. He reloaded the gun after he had left the scene, about a mile away.

Defendant's witnesses, Robert Paloma, Steven Tienda (Buzzy), and Raymond Juarez, substantially corroborated defendant's testimony that the Junior Spartans were the aggressors, and that defendant interceded on behalf of Tienda (Buzzy). Paloma testified that Tinoco and "Cotton Head" were the ones that hit Tienda. "Jesse said to leave him alone. They started coming towards him. . . . Perez, Salvadore, and those others. They stepped towards Jesse Pena. . . . Jesse Pena pulled out his gun. He started waving it. He said . . . to get back. They kept on coming. . . . Well, that is when I heard the shots." He heard about three shots, and there were words exchanged before the shooting. Tienda (Buzzy) also testified that Perez and "Cotton Head" were the aggressors. "Cotton Head" hit Tienda in the mouth, and Tinoco threw a cigarette in his face. Defendant interceded, and they told him to keep out of it " 'or else we will take care of you too.' . . . Then they started going towards Jesse. . . . that's when Jesse pulled out a gun and told them to get back. They kept on coming. Jesse fired from the back." He heard about four shots fired, and he saw Pena shoot when the boys were running. Juarez testified that "Buzzy said 'I don't want to fight you.' Jesse Pena then said 'Get out of here,' and pulled a gun. Then, Dragan said 'Go ahead

and shoot me.' Someone said, 'Go ahead and shoot. See how brave you are.' So Pena shot."

Defendant's principal contention is that "it was reasonable under all the circumstances for the defendant to believe that the use of deadly force was necessary for his own defense." People v. Williams, 56 Ill App2d 159, 205 NE2d 749 (1965); People v. Bush, 414 Ill 441, 111 NE2d 326 (1953); People v. Turner, 385 Ill 344, 52 NE2d 715 (1944); People v. Evrard, 55 Ill App2d 270, 204 NE2d 777 (1965).

In People v. Williams, 56 Ill App2d 159, 205 NE2d 749 (1965), a cabdriver got out of a cab and attempted to help an old man who was being severely beaten by a group of boys. The boys threw a cement block and a brick at defendant's cab, causing damage to the right door. The defendant fired two shots in the direction of the boys, and one was killed. The Second Division of this court reversed a conviction of involuntary manslaughter. In discussing the elements which justify the use of force in the defense of his person, the court said (p 165):

"These elements are: (1) that force is threatened against a person; (2) that the person threatened is not the aggressor; (3) that the danger of harm is imminent; (4) that the force threatened is unlawful; (5) that the person threatened must actually believe: (a) that a danger exists, (b) that the use of force is necessary to avert the danger, (c) that the kind and amount of force which he uses is necessary; and (6) that the above beliefs are reasonable. There is a further principle involved, when, as in the instant case, the defendant uses deadly force. This principle limits the use of deadly force to those situations in which (a) the threatened force will cause death or great bodily harm or (b) the force threatened is a forcible felony."

311

After examining the facts of the Williams case in the light of the foregoing elements, the court further said (p 169):

> "It is apparent that the throwing of bricks at defendant could have caused death or great bodily harm if defendant was struck by one of them. Defendant was justified in using deadly force to protect his person.
>
> "In this case we only hold that when a person comes to the aid of another who has been the victim of a battery, said person has the right to use deadly force, if the parties who were the assailants attack him and if the other requirements of self-defense are met. The circumstances of this case present a situation in which we approach the minimum borderline of self-defense. The circumstances are such, however, that the judgment must be reversed."

In People v. Bush, 414 Ill 441, 111 NE2d 326 (1953), defendant Bush was convicted of murder. Bush, age 20, and his girl friend were approached on the street by another group of boys, and an argument ensued. The police broke up the argument. Later,. as the boy left the home of his girl friend, "he was surrounded menacingly by the same group of youngsters estimated in number from ten to nineteen." By some mysterious process, a knife was passed into his hand, and "After I got the knife the Sterling boys and the rest of the boys started crowding me and I was cutting them to keep them off, I was cutting at all of the boys—not any particular one." In holding that the slaying by defendant was a justifiable act of self-defense, the Supreme Court said (p 444):

> "The defendant was where he had a lawful right to be and it was not his duty to flee, but being

assaulted first he had a right to stand his ground and if reasonably apprehensive of serious injury was justified in taking his assailant's life. (People v. Durand, 307 Ill 611.) We have repeatedly held that one who is unlawfully assaulted and put in apparent danger of his life or of great bodily harm need not attempt to escape but may repel force with force, even to the taking of assailant's life, if necessary or apparently so, to prevent bodily harm. Hammond v. People, 199 Ill 173."

The State contends that "under the circumstances of this case, it was unreasonable for the defendant to believe that the use of deadly force was necessary." People v. Jordan, 18 Ill2d 489, 165 NE2d 296 (1960); People v. Millet, 60 Ill App2d 22, 208 NE2d 670 (1965); People v. Golson, 392 Ill 252, 64 NE2d 462 (1946).

In People v. Jordan, the Supreme Court affirmed a judgment of murder as against a plea of self-defense and said (p 492):

"In order that a killing be justified on the grounds of self-defense it must appear that the danger was so urgent and pressing that in order to save the defendant's own life or to prevent his receiving great bodily harm the killing of the other was absolutely necessary and it must appear also that the person killed was the assailant or that the slayer had really and in good faith endeavored to decline any further struggle before the mortal blow was given. . . . Whether a killing is justified under the law of self-defense is always a question of fact to be determined by the jury under proper instructions."

In People v. Millet, 60 Ill App2d 22, 208 NE2d 670 (1965), defendant was convicted of voluntary manslaughter. Defendant had been warned that the dece-

313

dent had a gun in his trunk; that decedent said "he would blow defendant's head off and would kill him"; and that defendant opened the trunk of his car and fumbled inside for some object. In affirming the conviction, the court said (p 30) :

". . . we further find, contrary to defendant's contention, that the fear experienced by defendant was not so great that defendant could take the life of another. . . . True, there is no duty on a defendant to retreat from a wrongdoer. . . . Defendant, however, in the instant situation, affirmatively approached the deceased. He set the stage for the type of violation found in section 9(2)(b) of the Code. We hold therefore, that there was sufficient evidence introduced that defendant, despite his fear of bodily harm, acted unreasonably under the circumstances."

■■ In a bench trial in a criminal case, a reviewing court, in view of the opportunities of observation available to the trial court, will not disturb a guilty finding unless the proof is so unsatisfactory or implausible as to justify a reasonable doubt as to a defendant's guilt. People v. Woods, 26 Ill2d 582, 585, 187 NE2d 692 (1963) ; People v. Boney, 28 Ill2d 505, 510, 192 NE2d 920 (1963).

It is not controverted that the decedent and his group were the aggressors or that "Cotton Head" and Perez intended to assualt Tienda (Buzzy), and that defendant came to his aid. Before entering judgment, the trial court reviewed the testimony at length and defendant's defense that he acted justifiably. The court remarked, "There is no evidence any of them had any deadly weapons or that any of them used any great force. The only one who did anything real mean and vicious was

Tinoco, who threw the cigarette in his face. Jesse Pena pulled the gun and he says he tried to scare them, first. But he fired and he kept firing after they began to run. That appears to be the evidence beyond a reasonable doubt. This Court finds Pena acted as follows: He is covered by section 9–2B of Chapter 38 of the Criminal Code, which provides 'A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code, but his belief is unreasonable.' His belief certainly was unreasonable. He was not the aggressor, however. He didn't especially want to kill Dragan Petrovich, but intended to shoot the boys he felt were looking for him, which they were. Therefore I find Jesse Pena guilty of the lesser included offense of voluntary manslaughter."

█ We conclude the evidence here supports the trial court's determination that defendant acted unreasonably under the circumstances, and that the proof was sufficient to support the conviction of voluntary manslaughter. Therefore, we will not disturb the finding of the trial court.

█ Defendant also contends that "probation would have been adequate under the circumstances for the defendant so as to best effect his rehabilitation." (People v. Evrard, 55 Ill App2d 270, 204 NE2d 777 (1965).) The record shows that before sentencing defendant, the trial court considered at length the background of the defendant and the testimony of a representative of a local church and interviewed defendant's father and mother, and concluded that the sentence given him was proper under the circumstances and that defendant "needs some punishment, some serious punishment. His

315

own father couldn't handle him." We find no reason here for this court to reduce the sentence imposed by the trial court.

For the reasons given, the judgment of the Criminal Division of the Circuit Court of Cook County is affirmed.

Affirmed.

KLUCZYNSKI, P. J. and BURMAN, J., concur.