**People of the State of Illinois, Plaintiff-Appellee, v. Robert Adams, Defendant-Appellant.**

**Gen. No. 52,355.**

First District, Fourth Division.

July 23, 1969.

Rehearing denied September 18, 1969.

Delars J. Bracy, of Chicago, for appellant.

John J. Stamos, State's Attorney of Cook County, of Chicago (Elmer C. Kissane and Sheldon M. Schapiro, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE ENGLISH delivered the opinion of the court.

OFFENSE CHARGED
Murder. Ill Rev Stats (1965), c 38, § 9–1.

DEFENSE AT TRIAL
Self-defense. Ill Rev Stats (1965), c 38, § 7–1.

JUDGMENT

After a bench trial, defendant was found guilty of voluntary manslaughter (Ill Rev Stats (1965), c 38, § 9–2) and sentenced to a term of 2 to 10 years.

POINTS RAISED ON APPEAL

(1) The evidence does not support a conviction for voluntary manslaughter.

(2) The sentence is excessive.

EVIDENCE

Robert Jackson, for the State

He is the stepfather of the deceased, Bernice Adams, and had known her for 27 years. On December 4, 1965, she was the wife of defendant. The deceased had spent the night of Friday, December 3, at the witness' house at 7113 South Racine. She left sometime the following morning, and he next saw her at noon that day in a tavern next to his home. He had been drinking with the deceased and defendant's brother when defendant entered the tavern, knocked her off the bar stool, and left. He next saw her at the Cook County Morgue, at which time she was dead.

Barbara Stevenson, Oscar Jones and Claude High, for the State

These witnesses, all of whom were fellow employees of the deceased at Knickerbocker Case Co., testified to having seen the killing. Their testimony contained no substantial contradictions and on all important points they corroborated each other. Piecing their testimony together, they gave this account:

On December 4, 1965, the deceased arrived at Mrs. Stevenson's apartment at about 10:30 a. m. and they left together in deceased's 1964 blue Falcon. On the way to deceased's home, they entered a tavern near 71st and Racine and had one or two beers at the bar with deceased's stepfather. Shortly after they arrived, defendant entered and tried to get the deceased to leave with

him, but she refused. He hit her, knocking her off the bar stool, and then he left. The two women left about 1:30 p. m. to go shopping, after which, at about 5:30 p. m., they went to the home of Claude High. Deceased's automobile at that time was in good condition. Also present at High's apartment were Oscar Jones and Cora Barnes who had gone there to watch a football game.

Later, while in the apartment, a loud crashing sound was heard outside. Jones, Mrs. Stevenson, and the deceased went out and discovered that all the tires on deceased's car had been slashed and all the windows broken. They returned to High's apartment to call the police, and then, with High, the four of them returned to the car. Mrs. Stevenson and Jones were standing in the street at the rear of the car, and the deceased and High were on the sidewalk when defendant drove up, stopped his car in the middle of the street, got out, and walked over to the deceased. As he approached her, High saw that defendant had a knife with a 5- or 6-inch blade in his right hand. Mrs. Stevenson and Jones did not see a knife from where they were standing. The deceased asked defendant, "Why did you tear up my car?" to which he replied, using obscenities, "I tore it up and I will do you the same way." Defendant then began to swing, hitting the deceased numerous times. (The witnesses' estimates varied from "four or five" to "seven to ten" times.) High testified that defendant was striking her with the knife; that he then pushed her onto the hood of the car and stabbed her in the thigh. She did not put up much of a struggle and never struck defendant. She yelled, "Robert, you done cut me." Whereupon, defendant returned to his car and left. As he walked away, he was still carrying the knife, according to High. Deceased walked to the porch and collapsed. High wrapped her in a sheet and took her in his car to St. Bernard's Hospital, where she was pronounced dead.

209

Jones testified that he said nothing to defendant and did not try to strike defendant with an iron object; that he was a close friend of the deceased, but she was not his girl friend. She had lent him $65 when his daughter was hospitalized.

Dr. Eugene H. Tapia, for the State (by stipulation)

He is an assistant coroner's pathologist who, on December 5, 1965, examined the body of the deceased. There were multiple lacerations on the body, one such stab wound entering the abdominal cavity through the ribs, and another was a deep two-inch cut in the right leg which severed the right femoral artery. In his opinion, death was caused by a hemorrhage due to the stab wound of the right femoral artery. In the blood there was present 158 mg. percent of ethyl alcohol.

Police Officer Louis Pote, for the defense

On December 4, 1965, Captain Gall, Officer Spivack, and he investigated a disturbance at 6634 South Union. Finding no one at that address, they proceeded to St. Bernard's Hospital, where they saw the deceased with two men and a woman who explained that there had been a fight. At the police station, he interviewed High who stated that the deceased had come down and found her car damaged; that when defendant appeared, the deceased had gone up to him, and in the ensuing altercation there was a cutting. High was with a man who was allegedly going with the deceased. He detected the odor of alcohol on the breath of these people.

Police Captain Paul Gall, for the defense

(His testimony was substantially the same as that of Officer Pote.) The inference from his conversations with Jones, High, and Mrs. Stevenson was that the deceased possibly started the argument with defendant.

Calvin Krutchfield, for the defense

About 7:00 p. m. on December 4, 1965, he was leaving the apartment of a friend at 6640 South Union when he saw a man step out of a car on the corner and walk

210

towards a group of three or four people. There was some shouting, and a woman said, "What did you break up my car for?" The woman approached the man with a knife or something in her hand and backed him into a parked car. Two men approached from either side, and one of these men held a piece of iron or something in his hand. The cornered man jumped into the woman and held her to shield him from the other two men. The woman was striking at the man with a knife, but the knife never came in contact with him.

He had never seen defendant or any of the other parties before that date. He could not remember any of the faces of the people at the scene, nor could he remember exactly how many people were involved. While he was 5 or 6 feet away, he was not positive that defendant was the man who got out of the car. He heard about the killing from the radio, but did not go to the police at that time.

Willie Cardine, for the defense

She is a sister of defendant, and had lived with him and the deceased until November, 1965. Defendant treated the deceased well, but she tried to hurt him. In April, 1965, she shot at defendant with a small pistol; in November, 1965, she tried to cut him with a kitchen knife; and at another time, she tore up his clothes and furniture and threw a chair at him. These incidents were not reported to the police.

Hattie Jones, for the defense

She is also a sister of defendant. On December 4, 1965, at 6:30 or 7:00 p. m., she and defendant drove to 66th Place and Union Avenue. Defendant got out of the car and went to a group of people standing near the corner to see if his wife (the deceased) was among them. Her car was there, and it was smashed up. The people began shouting at defendant, calling him names and accusing him of having torn up the car. The deceased stepped from the group with a knife in her right hand

and began to strike at him. The witness shouted to defendant to watch out. A man was behind deceased holding a piece of pipe or something in his hand. He was trying to get to defendant, but he never did. Defendant and the deceased were tussling and she continued to strike at him, cutting his right hand and his coveralls. The witness got back in the car as defendant pushed himself away from the deceased, got back in the car, and said, "Let's go." They went.

She did not recall seeing defendant bleed from the struggle. She did not see the deceased drop the knife or the defendant take it from her. Defendant had nothing in his hand when he returned to the car, and she never saw a knife in his hand.

Joe Arnold, for the defense

At 8:30 p. m. on December 4, 1965, defendant came to his home with cuts on his coveralls and on his left hand. Defendant said his wife cut him, and he asked for medication.

In April, 1965, the witness was visiting in defendant's home when defendant and the deceased had an argument. She said she would shoot him. The witness saw a small gun in the dining room, and said to his wife, "Let's go home"; and then went. He did not hear any shots.

The witness' wife is defendant's cousin.

Robert Adams, defendant, on his own behalf

He is self-employed, with a delivery service. He married the deceased in June, 1963. In a tavern at noon on December 4, 1965, he saw his wife, who had not been home the night before. He caught her by the hand to take her home, but she jerked free and fell off the stool. He did not hit her. He then returned home alone.

At about 5:30, he discovered that $1,500 cash was missing from his home, and he went out to find his wife. Upon finding her car at 66th Place and Union Avenue, he took the jack handle out of his trunk and broke the

glass in her car and punctured the tires. No one came out to investigate, so he went to a gas station and called his sister. His sister arrived in her car, and he drove back to 66th and Union. He got out of the car and walked towards a group of people who started cursing him. His wife yelled, "Did you tear up this car?" and he replied, "Yes, I did." His wife charged into him with a knife in her hand and started swinging at him. He backed against his sister's car, grabbed his wife's hand, took the knife away, and continued to fight, making several swings at her with the knife. Oscar Jones held a hammer or a "kid's" baseball bat in his hand and yelled, "Get to him," but Jones never got to him. In the struggle, his hand was cut and his coveralls were snagged. He returned to his sister's car and said, "Let's go." He had taken the knife and had put it in his pocket. He then went back to the service station and placed the knife over the windowsill in the washroom. He later retrieved the knife and gave it to the deputy coroner. That evening he went to the home of his cousin, Joe Arnold, where he told Joe what had happened and received some medicine for his hand. He did not know that his wife was dead until he called home.

In April, 1965, he had quarreled with his wife, and she pulled a gun on him. She shot at him, but the bullet went through the window. In November, 1965, his wife had thrown a knife at him as he was pulling away in his car, but it missed. Also, she once threw a brick at him. None of these incidents was reported to the police. On December 4, 1965, when his wife attacked him, he was in fear of his life and his bodily safety. He acted in self-defense.

Hattie Jones, recalled for the defense

In prior testimony, she stated that the right shoulder of defendant's coveralls and defendant's right hand were cut. She was mistaken, because in fact the left shoulder

and the left hand were cut. She is a sister of defendant and was present in court during the testimony of Joe Arnold and defendant.

Police Officer Louis Pote, recalled as rebuttal for the State

He examined the deceased's car when he first investigated the disturbance. He noticed the tires were slashed with three or four-inch cuts. These slashes could have been made from a jack handle but not by just pushing it in. He found fresh blood stains on the sidewalk.

OPINION

(1) Defendant contends that the evidence does not support a conviction for voluntary manslaughter. First, he states that the evidence conclusively shows he acted in self-defense. If self-defense is not sustained, he argues that murder, not manslaughter, is the only possible conviction from this evidence, and that the conviction for manslaughter amounts to an acquittal on the murder charge.

Defendant was indicted for murder. Ill Rev Stats (1965), c 38, § 9–1. The State's case in chief included the testimony of three friends of the deceased who witnessed the occurrence. Their evidence was to the effect that defendant, without provocation, cut the deceased with a knife, and she died as a result of this attack.

■ The defense at trial was that defendant had used force upon the deceased only in his own defense. The pertinent statute provides:

7–1. Use of Force in Defense of Person.

A person is justified in the use of force against another when and to the extent that he reasonably believes that such conduct is necessary to defend himself or another against such other's imminent use of unlawful force. However, he is justified in the use of force which is intended or likely to cause death or great bodily harm only if he reasonably

believes that such force is necessary to prevent imminent death or great bodily harm to himself or another, or the commission of a forcible felony. Ill Rev Stats (1965), c 38, § 7–1.

This is an affirmative defense (Ill Rev Stats (1965), c 38, § 7–14), and, therefore, once properly raised by some evidence of all elements of the defense, it must be overcome by proof beyond a reasonable doubt to sustain a conviction. Ill Rev Stats (1965), c 38, § 3–2. See IPI, Criminal, §§ 24.06 and 25.05.

Defendant presented the issue of self-defense through his own testimony, that of Hattie Jones (his sister), and Calvin Krutchfield. This testimony was to the effect that the deceased was the aggressor; that she came toward defendant with a knife in her hand and tried to stab him with it, cutting his clothing and hand; that defendant wrested the knife from her, but he was still cornered, so he used deceased to shield himself from Jones who carried a bat-like object in his hand. He used the knife he had taken from the deceased, but it is interesting to note that none of these three witnesses testified to defendant's having used the knife on the deceased. Additional evidence was presented of three occasions on which the deceased had tried either to injure or kill defendant.

■■■■■ Self-defense is always a question of fact to be determined by the trier of fact. People v. Pena, 72 Ill App2d 305, 219 NE2d 667; People v. Colson, 70 Ill App 2d 447, 217 NE2d 348; People v. Millet, 60 Ill App2d 22, 208 NE2d 670; People v. Jordan, 18 Ill2d 489, 165 NE2d 296. When, after raising this defense, there is a guilty finding, a reviewing court will not reverse that determination unless it is so unsatisfactory or improbable as to justify a reasonable doubt of the defendant's guilt. In this case we believe that the evidence was sufficient to disprove beyond a reasonable doubt defendant's

claim of self-defense. Defendant here was openly hostile to his wife. At noon on the day in question, he engaged in a dispute with her which resulted in her falling to the floor. He admittedly broke the windows of her car and slashed its tires. While the defense witnesses did not testify to it, neither did they deny the testimony that defendant repeatedly struck the deceased with a knife. The medical evidence about knife wounds, plus the fact of death, is strong corroboration of the State's witnesses. On the other hand, there is dispute as to whether the deceased struck defendant at all. Although there is no duty to retreat in face of a wrongdoer (People v. Millet, 60 Ill App2d 22, 30, 208 NE2d 670; People v. Durand, 307 Ill 611, 139 NE 78), there is no showing that defendant attempted in any way to decline or avoid the peril before dealing the fatal blows. Also, with the apparent control he had of the situation and the ease with which he extricated himself from it, there is no real possibility that he could reasonably have believed that the use of deadly force was necessary for his own defense. Our conclusion in this regard is supported by People v. Honey, 69 Ill App2d 429, 217 NE2d 371 cited by defendant, although that case is distinguishable on its facts.

Defendant was found guilty of voluntary manslaughter. A trial court may convict for voluntary manslaughter on an indictment for murder, provided there is evidence to support the lower grade of homicide. People v. Green, 23 Ill2d 584, 179 NE2d 644; People v. Lewis, 375 Ill 330, 31 NE2d 795. As defendant points out, conviction of the lesser crime of voluntary manslaughter does amount to acquittal of the greater crime of murder. People v. Newman, 360 Ill 226, 195 NE 645; People v. McMurry, 64 Ill App2d 248, 212 NE2d 7. And it is also true that if the evidence in such a case fails to support the finding of voluntary manslaughter, the conviction must be reversed outright and the defendant relieved of

all jeopardy. People v. Newman, supra. In this context of the law, defendant claims that his conviction of voluntary manslaughter is unsupported by the evidence. We conclude, however, that, while the State presented its case for murder, and defendant offered some evidence of self-defense, the State adequately met its burden of proof with evidence sufficient to support the trial court's guilty finding as to the lesser crime.

 Often, when a defendant is charged with murder and he pleads self-defense, the conviction is for manslaughter. People v. Pena, 72 Ill App2d 305, 219 NE2d 667; People v. Jordan, 18 Ill2d 489, 165 NE2d 296; People v. Millet, 60 Ill App2d 22, 208 NE2d 670; People v. Lockett, 85 Ill App2d 410, 229 NE2d 386. The explanation for this lies in the close relationship between the two concepts. One definition of voluntary manslaughter is as follows:

> A person who intentionally or knowingly kills an individual commits voluntary manslaughter if at the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this code, but his belief is unreasonable. Ill Rev Stats (1965), ch 38, § 9–2(b).

Although the danger need not be real and the deceased need not be armed with a deadly weapon for a person to have a reasonable belief that his life is endangered to the point of justifying a killing (People v. Lockett, 85 Ill App2d 410, 229 NE2d 386), we think that defendant here could not reasonably have believed that killing was necessary to prevent his own death or great bodily harm at the hands of the deceased. See People v. Colson, 70 Ill App2d 447, 217 NE2d 348; People v. Millet, 60 Ill App2d 22, 208 NE2d 670. Defendant, by his own testimony, had disarmed the deceased, and he, himself, held the most deadly weapon at the scene. He further

217

testified that he successfully controlled the deceased to shield himself from the others until he decided to flee the scene. Under these circumstances, the trial court could justly determine that defendant may have believed that his use of deadly force was necessary in his own defense, but that such belief was unreasonable.

There is also sufficient evidence to furnish another basis for a voluntary manslaughter conviction in this case. The statute provides further:

> A person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by:
>
> (1) the individual killed, . . .
>
> Serious provocation is conduct sufficient to excite an intense passion in a reasonable person. Ill Rev Stats (1965), c 38, § 9–2(a)(1).

It is clear that there was an altercation between defendant and the deceased at the time in question. By defendant's own testimony, the deceased struck at him with the knife; they struggled and he gained possession of the knife. He then tried to defend himself from the deceased and the man behind her who charged several times,* but never got to defendant because the deceased was kept between them. Defendant did not know if he put the knife in her body, because he was trying to defend himself. He did not know whether he swung the knife or whether he touched her with it. He was holding her, and she was holding him and fighting and kicking. He sometimes held her with both hands. He held the knife in his right hand the entire time and took it with him

---

* Much of the testimony recited in this paragraph is not found in defendant's abstract, but only in the record.

when he left, putting it in his back pocket as he ran around the car. To this testimony of defendant must be added the undisputed report of the coroner's pathologist concerning the multiple stab wounds inflicted upon the body of the deceased.

On this evidence, the trial court could reasonably have found defendant to be acting under sudden and intense passion resulting from the provocation of what he testified was an attack by the deceased, as there was no time for the "cooling of defendant's blood." (See People v. Walker, 55 Ill App2d 292, 204 NE2d 594.) His actions could therefore be considered, with reason, to fall within the second definition of voluntary manslaughter as quoted above. Thus, under either definition of the crime, the trial court's decision finds adequate support in the record. People v. Newman, 360 Ill 226, 195 NE 645, and People v. McMurry, 64 Ill App2d 248, 212 NE2d 7 cited by defendant, are consistent with this conclusion, although their decisions are distinguishable on the facts.

(2) Defendant also claims that the sentence of 2 to 10 years is excessive under the circumstances and should be reduced pursuant to Supreme Court Rule 615 governing the powers of the reviewing court. Ill Rev Stats (1967), c 110A, § 615(b)(4). This court unquestionably has the authority to reduce the punishment imposed by the trial court, but we do not believe that this case warrants its exercise.

The statutory limits of punishment on conviction for voluntary manslaughter are 1 to 20 years. Ill Rev Stats (1965), c 38, § 9–2(c). At the post-trial hearing in aggravation and mitigation, the State asked for a sentence of 12 to 20 years. In mitigation, the court heard that defendant was 32 years old, with no previous criminal convictions. He owns his home and enjoyed a good reputation in the community. He is self-employed, operating a delivery service which does business with some well-known meat packing companies. He has four em-

ployees, and he owns five trucks which are operated in his business. When these matters were taken into consideration along with the evidence received upon the trial, the court was presented with sufficient information as to defendant's "moral character, life, family, occupation, and criminal record" to impose a studied and fair sentence within the general purposes of the criminal code. (Ill Rev Stats (1965), c 38, §§ 1–2(c), (d), and § 1–7(g).) When the sentence under review is within the statutory limits, it "will not be disturbed unless it constitutes a clear departure from fundamental law or is not proportioned to the nature of the offense." People v. Gold, 38 Ill2d 510, 232 NE2d 702. See also People v. Taylor, 33 Ill2d 417, 424, 211 NE2d 673; People v. Walewski, 91 Ill App2d 42, 234 NE2d 9; and People v. Grigsby, 75 Ill App2d 184, 220 NE2d 498. The trial judge had an opportunity, superior to ours, "in the course of the trial and the hearing in aggravation and mitigation to make a sound determination concerning the punishment to be imposed." People v. Taylor, supra. We cannot say that defendant's penalty, as determined by the trial court, was excessive, and we will not modify that sentence.

JUDGMENT

The judgment of the Circuit Court is affirmed.

Affirmed.

DRUCKER, P. J. and McNAMARA, J., concur.