(No. 15157.—Judgment affirmed.)

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* ANTONE LANGZEM, Plaintiff in Error.

*Opinion filed February 21, 1923.*

1. CRIMINAL LAW—*when refusal of instruction as to presumption of innocent motive is not error.* In a prosecution for murder it is not error to refuse an instruction that when a man's conduct may be as consistently referred to an innocent motive as to a criminal motive it is the jury's duty to presume that the conduct was actuated by the innocent motive, where the instruction could not have benefited the defendant under the facts in the case and where its substance is contained in other instructions.

2. SAME—*prosecuting attorney should not argue the defendant's failure to produce certain witnesses—reversal.* In a trial for murder the State's attorney should not refer in his argument to the fact that the defendant did not produce certain accessible witnesses who, according to the defendant's testimony, were present at the shooting, but the ruling of the court that while the defendant is not required to produce any witnesses, "counsel may show what the defendant has done with respect to witnesses" will not cause a reversal, where there was no attempt to follow the suggestion and the evidence of guilt is clear.

WRIT OF ERROR to the Circuit Court of Sangamon county; the Hon. E. S. SMITH, Judge, presiding.

EDMUND BURKE, and JOHN G. FRIEDMEYER, for plaintiff in error.

Edward J. Brundage, Attorney General, C. F. Mortimer, State's Attorney, and George C. Dixon, (Edward Pree, and J. M. Weldon, of counsel,) for the People.

Mr. Justice Dunn delivered the opinion of the court:

This writ of error was sued out by Antone Langzem to reverse a judgment of the circuit court of Sangamon county by which he was convicted of the murder of Tony Paculis and sentenced to imprisonment in the penitentiary.

It is contended that the verdict and judgment are not sustained by the evidence. The homicide occurred in the early morning of May 15, 1922, near the corner of Thirteenth street and Black avenue, in the city of Springfield. The plaintiff in error, who was twenty-nine years old, lived with his family, consisting of his wife and two small children, on a lot which he owned on Black avenue, a street running east and west. His lot, which was on the north side of the street, was 135 feet long, extending north from the street. He was erecting a dwelling on the south part of the lot, the frame of which had been raised and which had been roofed but was not otherwise enclosed, and he was occupying, with his family, a small building on the back end of his lot intended to be used as a barn but which had been fitted up temporarily for the use of the family as a residence during the construction of the dwelling. Back of this building was an alley at the north end of the lot. Across Black avenue was the residence of Joe Bernoski, who occupied it with his wife and two boarders, Jake Miscavitch and Tony Paculis. A short distance west of these houses, with nothing between, was Thirteenth street, running north and south, which was not improved, and the ground on the west side of that street was not enclosed or improved but lay open as a common. It is spoken of by the witnesses as the pasture, the ball ground and the show ground. The plaintiff in error is a Lithuan-

ian.  On Sunday night, May 14, there was a gathering of
people at his home, composed, at first, of Mrs. Wallaka-
vitch, a neighbor who lived across the alley north of the
plaintiff in error's house and is a sister of Joe and John
Bernoski; Charlie Krapavitch and his wife and their little
girl; one Matlavich and his wife, and Steve Chenski and
his wife.  Later John Bernoski and George Pauckstitis
came, and about midnight, or shortly before, William Casper
and Tony Paculis came also.  The party continued until
one o'clock or after, having some drink and dancing.  Then
a disagreement arose between Chenski and Paculis, and
Chenski slapped Paculis on the mouth.  According to
Casper the dispute arose over a bet between Chenski and
Paculis as to whether Casper or Chenski was the better
dancer.  Paculis bet a dollar that Casper was, while Chen-
ski bet on himself.  They danced and Paculis said Casper
won the dance.  Chenski said, "You not going to get no
dollar," and after some words Chenski slapped Paculis and
Casper pulled Chenski away.  The plaintiff in error said:
"Let me on; I can fight in place of you," and jumped at
Paculis.  Paculis, Chenski and Pauckstitis left the house
and everybody followed them out.  They went through the
yard west to Thirteenth street, going home, and the plain-
tiff in error said: "Get to hell out of there! Get to hell
out of my yard!" and began shooting at them.  They started
to run but thought he was just shooting for fun and stop-
ped and talked.  The plaintiff in error shot again and hit
Paculis.  This was Casper's testimony.  The bullet entered
the right side of the chest, passing through to the muscles
of the back in the region of the right kidney.  Soon after-
ward the police came and the plaintiff in error and John
Bernoski were arrested and Paculis was taken to the hos-
pital, where he died two days later.  Before his death he
made a written statement, which was introduced in evi-
dence on the trial, without objection, as a dying declara-
tion.  The following is that statement:

"I, Tony Paculis, realizing that I am dying, and having given up all hope of recovering and firmly believing that death is at hand, do hereby make the following statement as to the cause of my injury: That on Monday morning, May 15, 1922, I was at Anton Langzem's house about one o'clock A. M.; that I made a bet of one dollar with Steve Chenski that Bill Casper could beat him dancing. I thought Bill Casper did beat him dancing and refused to pay Steve Chenski his dollar. Then Anton Langzem got in an argument with me over the dollar, and I told Anton Langzem I would go home. Then Bill Casper, George Pauckstitis and I started to go. We went out the back way, and when we got about 150 feet out in the field I heard a shot and turned around and saw Anton Langzem shooting at me. I started to run and one of the shots hit me, of which I am now dying. I am unable to write and hereby make my mark to this my dying statement, in the presence of Bill Lanuski and my brother, Stanly Paculis, this 17th day of May, 1922."

Mr. and Mrs. Krapavitch and Mr. and Mrs. Chenski had come in automobiles, which were at Thirteenth street and Ridgely avenue, the next street north of Black avenue. They left the plaintiff in error's house at the same time as the others and were not present during the shooting,—at least they did not testify on the trial. The only ones who were present in the plaintiff in error's house who did testify were the plaintiff in error, Casper, Pauckstitis and John Bernoski. Joe Bernoski and his wife, Anna, and Jake Miscavitch, also testified for the People, as well as Campbell and Snider, policemen who arrested the plaintiff in error. The testimony was direct and positive that after the party left the house the plaintiff in error came out of the house; that he fired three shots in succession from a revolver, which were ineffective, and shortly after fired a fourth shot, which struck Paculis.

It is insisted that the evidence was contradictory and uncertain; that some of the witnesses were impeached by contradictory evidence given before the coroner's jury and others by contradictions appearing in their testimony given on the trial, and that therefore the evidence is so uncertain as to be insufficient to establish the guilt of the defendant beyond a reasonable doubt.

Pauckstitis, who was with Casper and Paculis when Paculis was shot, testified that after they started out to the pasture the plaintiff in error started shooting. In answer to the question, "Who started shooting?" his reply set out in the abstract is: "I don't know,—I can't tell sure,—but I never see that; and you know that man—I can't see—on the lot—I see on the lot a couple,—maybe some three or four,—something like that." He said that the shooting came from Langzem's lot and he did not count the shots; that he was scared and ran into the pasture; that the shooting stopped and all three went close to Bernoski's house, where Tony lived, and were standing talking when another shot came from the corner of Langzem's lot which struck Paculis in the breast. He did not see the man but saw the blaze. Paculis was on the pasture about a hundred feet from Bernoski's house when the last shot was fired.

Joe Bernoski, who lived on the south side of Black avenue opposite the house of the plaintiff in error, was sleeping in a room on the north side of his house, with the windows open. He heard a shot, lifted up his head and saw Casper, Paculis and Pauckstitis running southwest. John Bernoski joined them. He heard two more shots. Tony Langzem was firing right close to his house. After the third shot was fired John Bernoski, coming back, said to Langzem, "You shoot me! You shoot me!" Langzem said: "John, excuse me; I don't shoot you; I shoot them fellows." They stepped on Bernoski's porch and he told them to get away; that he didn't want them to shoot around his house. Langzem went home and John Bernoski went into the alley back of Langzem's, and not very long after there was a fourth shot. Bernoski did not see Langzem,—he just saw the light, and Paculis said he was shot. When John Bernoski and Langzem were talking they were about thirty feet from the witness' house,—just across the street. Bernoski did not see who fired any of

the shots,—he just saw the light. The last shot was fired from close to his house,—about fifty feet away. The shot came from Langzem's house and was fired out in the pasture, west of Thirteenth street.

Anna Bernoski, Joe Bernoski's wife, testified that she was in the house, looking through the window, and saw Langzem shooting. At first she heard three shots, and after awhile three again, and then one shot at the time Paculis was killed. Langzem fired all the second three shots. Paculis, Pauckstitis and Casper were in the pasture while he was shooting. Langzem said, "I will kill them all," and immediately fired the last shot. After the three shots were fired, and before the last shot, John Bernoski said, "Why did you shoot me?" and Langzem said, "Excuse me; I didn't try to shoot you but Paculis,—going to shoot Paculis." Mrs. Bernoski was standing on the porch at that time,—she thinks not more than forty feet away from them. After Langzem fired the third shot he went to his house on his lot before the last shot was fired. As he was walking to his house there was something in his hand which looked like a revolver. There was a full moon and she could see the faces of the people about whom she testified. She did not hear John Bernoski say he was going to kill the whole bunch. He was so drunk that he made lots of noise but nothing else.

John Bernoski testified that he was at Langzem's house but did not know what happened there,—he just heard two shots. He did not remember having any conversation with Langzem. He said he was too much drunk that time and don't know about it,—don't remember much.

Jake Miscavitch lived at Joe Bernoski's. He was in the house,—in the basement. He heard shots about 1:30. At that time he was in his room,—the front room on the north side, on the ground floor. There was a big crowd coming from Langzem's house and lots of people running out. Then Langzem came out of the house, shooting one

shot right in the middle of the lot and one·shot close to the street,—the third shot. Miscavitch did not see anyone out west in the pasture at that time. After the third shot, Paculis, Casper and Pauckstitis went and started on Thirteenth street. Langzem fired the last shot,—the fourth shot. He was close to his house,—against the fence,—against the post. When Paculis was shot he said, "Tony Langzem shoot me." Casper, Paculis and Pauckstitis ran out from Langzem's house the time that he was shooting and started to go home. When Langzem fired the last shot he was against the wire,—the fence on the west side of Langzem's lot,—the side next to the back pasture. Langzem was about sixty feet away from his house,—a little house on the back of his lot,—when he fired this shot. He fired one shot the middle of the lot and one close to the house.

Several policemen came to Langzem's house immediately after the occurrence. Two of them testified that they arrested Langzem and John Bernoski and took them to the police station. When Langzem was asked what the trouble was and what the shooting was about, he said there was no trouble and pretended ignorance of what they were talking about. He said he had no gun; that there was no shooting around there and he knew nothing of it. Two of the officers started to search for a gun and found a small one, with some shells and cartridges for a larger one. They asked him for the gun that shot those shells, and he said he had no gun,—knew nothing about it. They lifted the mattress which was on the bed and under it found· a blue-steel revolver with about a six-inch barrel, 38-caliber, special make, which had six cartridges in it and smelled of powder as if it had been recently shot.

The plaintiff in error testified that he was twenty-nine years old, was a Lithuanian and came to this country when he was seventeen, and was a coal miner. On the evening of May 14 some people were at his house and had a little

dance and a little drink and music. Before Paculis and Casper came, there had been no arguments or difficulty between any of those there. After they came Paculis watched the rest of them dance and called Chenski a pig, or something like that, and Chenski slapped him in the face. The plaintiff in error said, "I don't want any trouble, fellows; you better get out of here from this house; don't make any trouble in here." He told this to all of them. Paculis said: "All right; I going get out, and I going get out I fix all you fellows." Paculis, Casper, Pauckstitis, Chenski and Krapavitch went out northwest in the alley to the pasture, and when they went out the plaintiff in error stayed inside. The shooting was out in the pasture, west of the plaintiff in error's lot. Mrs. Wallakavitch, Mrs. Matlavich and the plaintiff in error's wife were outside, and he came out just as the shooting was done. No shots were fired after he came out. He did not fire any shot. He had a gun under the mattress on the bed. He kept it there to protect himself and his house. He fired two or three shots earlier that evening at a dog because it had bitten the little Krapavitch girl in the leg. (These were no doubt the first three shots which Anna Bernoski testified to hearing. Joe Bernoski also testified to hearing them.) The plaintiff in error denied all the incriminating evidence against him. He stated that he did not see anybody drop to the ground after the last shot or hear anybody cry that he was shot, and soon after he said to his wife, "Let's go to bed." He said that what he told the officers was, that he did not have any gun at all in his hands outside.

Seven witnesses testified to the good character of the plaintiff in error as a peaceable, quiet, law-abiding citizen.

The witnesses were all foreigners. Anna Bernoski testified through an interpreter. It is apparent from the record that none of the people who were present or who saw the occurrence were familiar with the English language or could express well in that language the account which they

gave of what occurred. From their hesitating, broken sentences it was frequently difficult, and sometimes impossible, to tell exactly what meaning they intended to convey. The apparent discrepancies in the testimony between the statements of some of them at different times may be explained by this condition. There is a confusion as to what Paculis said at the time he was shot. Some of the witnesses testified that his statement was, "I got shot," or, "Somebody shot me," and others that he said, "Tony Langzem shot me." He was immediately carried from the place where he was shot to Joe Bernoski's house, where he lived, a few yards away, and there; it was testified, he made statements that Langzem shot him. Apparently the witnesses have in some instances confused the statements made at the two times so close together. It appears clearly that there was a quarrel of some kind at Langzem's house between Chenski and Paculis and that Langzem told them all to leave the house. All went out of the house toward the pasture on the west. Chenski and Krapavitch went away in their automobiles. The other three men went toward the pasture. Four shots were fired by somebody and Paculis was killed. There is the direct evidence of two witnesses, Jake Miscavitch and Anna Bernoski, that the plaintiff in error fired those shots. The testimony of Casper, Pauckstitis and Joe Bernoski is very persuasive to the same effect. Langzem had a revolver in his house. When the officers came to arrest him he denied having any knowledge of the occurrence and denied that there had been any shooting around there. He denied having a revolver. He testified that the shots were fired in the pasture. He heard them and saw the occurrence but denied to the officers that he knew anything about it. The discrepancies in the testimony of the witnesses as to details, from what position the various shots were fired, the order of firing, the precise order in which things were done or said, and the exact language used, is no greater than is to be expected from the

testimony of different witnesses to an event which all have seen,—particularly when the witnesses labor under the difficulty which the witnesses here experienced, of an unfamiliarity with the language which was the vehicle of communication. The testimony was sufficient to sustain the verdict and no other conclusion than that of the plaintiff in error's guilt can be drawn from the evidence.

The court refused to give an instruction requested by the plaintiff in error that when a man's conduct may be as consistently referred to an innocent motive as to a criminal motive it is the jury's duty to presume that such conduct was actuated by the innocent motive and not the criminal. This instruction could not have benefited the plaintiff in error under the facts of this case, and its substance was contained in instructions 20, 21 and 23 given at the request of the defendant.

Mrs. Wallakavitch and Mrs. Matlavich were outside the house with defendant's wife, according to his testimony, at the time of the shooting. In the closing argument the State's attorney made the statement that the plaintiff in error did not see fit to put either one of these women on the stand in support of his position. This argument was objected to, and the court said: "The defendant is not required to produce any witnesses, but counsel may show what the defendant has done with respect to witnesses." An exception was taken to this ruling. It was shown that the two women referred to were still living in Springfield. The defendant was not bound to produce any witnesses. They were as accessible to the prosecution as to the defense, and no inference could be drawn against the defendant by reason of his failure to produce them. It was not shown that the defendant had done anything with respect to the witnesses, and the objection of his counsel should have been sustained. The error, however, was not sufficient to require a reversal of the judgment, particularly in view of the clear evidence of the defendant's guilt.

307—5

In cross-examining John Bernoski, counsel for the plaintiff in error asked him the question if he did not have a fight with somebody there that night and if somebody did not hit him on the head with a brick. The court sustained the objection to the question. No statement of what was expected to be proved was made. It was not intimated that the fight of John Bernoski had anything to do with the homicide, or when, where, with whom or how it occurred. There was nothing to indicate that the answer would have elicited any evidence material to the prosecution or the defense. The objection to it was properly sustained.

The judgment will be affirmed.    *Judgment affirmed.*

---

(No. 15067.—Judgment modified and affirmed.)
THE WARSAW COAL COMPANY, Plaintiff in Error, *vs.* THE INDUSTRIAL COMMISSION *et al.*—(DAVID KEIMBUSCH, Defendant in Error.)

*Opinion filed February 21, 1923.*

1. WORKMEN'S COMPENSATION—*when a pre-existing partial incapacity does not preclude award for total disability.* Where the evidence is sufficient to support a finding of total disability caused by a rupture on the employee's right side while doing heavy lifting in the course of the employment, the fact that the employee had sustained a rupture on his left side several years before will not preclude an award for total disability based upon the employee's average daily wage in his weakened condition previous to the second rupture.

2. SAME—*when award for total disability should not be reduced for failure to undergo operation.* An employer, on review of an award for total disability, is not entitled to have the amount of compensation reduced because the employee might have been cured by an operation, where the employee, on the hearing before the arbitrator, offered to submit to an operation but the employer made no offer to pay the expense of it.

WRIT OF ERROR to the Circuit Court of Peoria county; the Hon. JOHN M. NIEHAUS, Judge, presiding.