The People of the State of Illinois, Defendant in Error, v. Joseph B. Hatch, Plaintiff in Error.

Gen. No. 49,549.

First District, Fourth Division.

May 6, 1964.

178

Gerald S. Elliott, of Chicago, for plaintiff in error.

William G. Clark, Attorney General, of Springfield (Daniel P. Ward, State's Attorney, of Chicago, Fred G. Leach and E. Michael O'Brien, Assistant Attorneys General, Elmer C. Kissane and Matthew J. Moran, Assistant State's Attorneys, of counsel), for defendant in error.

MR. JUSTICE DRUCKER delivered the opinion of the court:

Defendant, Joseph Hatch, was convicted of the sale of narcotics in a bench trial before the Criminal Court of Cook County. The trial judge imposed a sentence of ten years to ten years and one day imprisonment, and from the judgment entered on this sentence defendant appeals.

On June 25, 1958, one Marzell Spurlark, a narcotics addict and a paid informer working on a per diem basis for the Federal Narcotics Bureau, was contacted by Agent Garrette Wimpey of the Bureau. Agent Wimpey, with whom Spurlark had worked before, told the latter that he wanted to make a "contact" but did not specify Hatch. Hatch and Spurlark lived across the street from each other and had been good friends for a period of about seven years since they first met as inmates at the House of Correction where each was serving time for possession of narcotics. Spurlark knew that Hatch was also an addict and informed Wimpey that they had once "shot up" together.

Agent Wimpey testified that at about 4:30 p. m. he went to the vicinity of defendant's home, followed by another Federal agent, and there met Spurlark and Hatch. Hatch testified that as he was leaving his home he was suddenly hailed by Spurlark who was sitting with Wimpey in a car parked in front of the house. In any event, Spurlark introduced Wimpey

179

as a friend of his who wanted some "stuff." Spur-
lark, called as the court's witness, testified that he
told the defendant that Wimpey was also an addict.
This Wimpey denied, testifying that he told the de-
fendant that the purchase was "strictly business."
Wimpey said to the defendant: "Sonny (Spurlark)
tells me you can do me so [sic] good." Wimpey testi-
fied that Hatch immediately replied, "Yes, I can take
care of you. What do you want?" The agent further
testified that he told Hatch he wanted one ounce of
heroin and that Hatch said it would cost $140 plus
$26 for him. Hatch, however, testified that he said
he didn't know whether he could get the narcotics
but told Wimpey that he would try. The informer's
version closely resembles defendant's.

The threesome then proceeded in Wimpey's car to
53rd and Prairie in Chicago where the defendant got
out and walked away. He returned several minutes
later and, according to Wimpey's testimony, an-
nounced that his supplier had to go get the stuff
and that it would be about thirty minutes. The three
men drove around Chicago for ninety minutes and
then returned to 53rd and Prairie. Hatch again left
the car, returning shortly to say that it would be
another few minutes.

The defendant again visited his source of supply
several minutes later and, according to his testimony,
was accompanied by Spurlark. Spurlark denied that
he left the car until after the sale was consummated.
Nevertheless, it is agreed that when the defendant
returned to the auto he got into the back seat with the
informer Spurlark who then purportedly said, "My
man wants to see what he's getting. Let's go some-
place too [sic]." Agent Wimpey, who was alone in
the front seat, drove off and parked in an alley.
He testified that upon stopping he turned around
and saw the defendant pass to Spurlark a small en-

180

velope which it was stipulated contained heroin. Spur-
lark immediately handed the envelope to Wimpey.

At this point there is a serious conflict in testimony
as to how the money for the heroin passed. Agent
Wimpey testified that he gave $140, the price agreed
upon, directly to defendant, and that Hatch then asked
for five dollars for "his trouble." (This, defendant
urges, is improbable in view of the fact of Wimpey's
earlier testimony that the parties had already agreed
upon $140 plus $26 for Hatch.) Hatch, however, tes-
tified that when the agent offered him some money
for arranging the sale he said, "He don't owe me
nothing"; that the agent gave $145 to Spurlark, and
that only subsequently did he accept five dollars from
the informer. Spurlark testified that the agent gave
Hatch nothing extra for the sale. The agent testified
that after paying the $140 plus five dollars to Hatch,
Hatch and the informer left the car together. After
the transfer of the money, according to Hatch, Spur-
lark accompanied him to his source of supply to make
payment for the delivery.

During the next two months Spurlark attempted to
get defendant to make further sales but the latter
consistently refused to do so. Hatch was not arrested
until August 22nd, which was almost two months after
the incident in question. Agent Wimpey stated that
the reason for the delay in arrest was that he left
on vacation soon after the incident; that this was
followed by his military leave; and that upon his re-
turn on about August 1st he believed that the defend-
ant was hiding out on a "shoplifting rap." He ad-
mitted that during this time he did not make any
attempt to arrest the defendant, that he did not even
visit the defendant's home to attempt to locate him.
Moreover, Wimpey further testified that no new in-
formation was gained through the arrest of the de-
fendant; that the man who he believed was defend-

181

ant's source of supply had been arrested, but that the agent was already aware of this source of supply and that the incident leading to defendant's arrest was not the beginning of the knowledge that he had of the dealings of Hatch's supplier.

The sole defense relied on by the defendant at the trial as well as on appeal was that the facts established an entrapment as a matter of law.

Entrapment has been defined by the Supreme Court of the United States in the following terms: "Entrapment is the conception and planning of an offense by an officer, and his procurement of its commission by one who would not have perpetrated it except for the trickery, persuasion, or fraud of the officer." Sorrells v. United States, 287 US 435, 454; Mr. Justice Roberts concurring. This definition of entrapment was expressly adopted by the Supreme Court of Illinois in People v. Strong, 21 Ill2d 320, 324, 172 NE2d 765.*

The elements of the defense of entrapment were set out in People v. Outten, 13 Ill2d 21, 147 NE2d 284, where the Supreme Court stated at page 23:

"As a general rule, entrapment can exist only when the criminal intent originates in the mind of the entrapping officer, and if such intent arose in the

* Although not applicable to the case at bar in which the incident occurred in 1958, the Illinois Criminal Code of 1961 (Ill Rev Stats, c 38, § 7–12) had adopted the defense of entrapment in similar terms:

A person is not guilty of an offense if his conduct is incited or induced by a public officer or employee, or agent of either, for the purpose of obtaining evidence for the prosecution of such person. However, this Section is inapplicable if a public officer or employee, or agent of either, merely affords to such person the opportunity or facility for committing an offense in furtherance of a criminal purpose which such person has originated.

mind of the accused there is no entrapment, though officers may afford an opportunity for the commission of the offense and use artifice and stratagem to apprehend one actually engaged in a criminal enterprise. It is not an instigation to perpetrate a crime if an officer, having reason to believe another is committing a crime, furnishes an opportunity for the commission of the offense, when the purpose is, in good faith to secure evidence against a guilty person and not to induce an innocent person to violate the law."

The policy behind allowing the defense of entrapment was well stated by Chief Justice Warren of the United States Supreme Court in the important case of Sherman v. United States, 356 US 369. It was there stated at page 372:

"The function of law enforcement is the prevention of crime and the apprehension of criminals. Manifestly, that function does not include the manufacturing of crime. Criminal activity is such that stealth and strategy are necessary weapons in the arsenal of the police officer. However, 'a different question is presented when the criminal design originates with the officials of the Government, and they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute.' "

See also Comment, Administration of the Affirmative Trap and the Doctrine of Entrapment: Device and Defense, 31 U of Chi L Rev 137 (1963).

██ Although the defense of entrapment is available in Illinois, it has been stated that "the defense in Illinois is accorded perhaps the narrowest scope of any American jurisdiction where it is recognized."

Comment, supra, at 148. In his brief in this court defendant himself recognizes that Illinois courts have not been liberal in their interpretation of the entrapment defense.

"Plaintiff in error is well aware of the plethora of entrapment cases in narcotics convictions which have been before the court in recent years and the reluctance of this court to hold an entrapment unless the evidence is clear and convincing that defendant would not have committed the crime but for inducement of the law enforcement agent; that if defendant showed a 'predisposition', 'acquiescence' or 'complaisance' to commit the crime then a distinction would be made between an entrapment and a mere opportunity afforded to commit the crime. People v. Outten, 12 [sic] Ill2d 21; People v. Gonzales, 25 Ill2d 235; People v. McSmith, 23 Ill2d 87; People v. Shannon, 15 Ill 2d 494; People v. Lewis, 26 Ill2d 542; People v. Clark, 7 Ill2d 163; People v. Hall, 25 Ill2d 297; (Br, p 12)."

In fact, the courts of Illinois have so strictly interpreted the entrapment defense that in only one case cited by defendant has such defense been upheld by the Supreme Court. In People v. Strong, 21 Ill 2d 320, 172 NE2d 765, the Supreme Court held that an entrapment was shown where the narcotics sold by the defendant in that case were supplied to him by the government informer only 45 minutes prior to the sale. The opinion in Strong is limited to its facts and is not of great solace to defendants seeking to rely on it. Mr. Justice Solfisburg, for a unanimous court, there stated at page 325:

"While we are sympathetic to the problems of enforcement agencies in controlling the narcotics traffic, and their use of informers to that end,

184

we cannot condone the action of one acting for the government in supplying the very narcotics that gave rise to the alleged offense. We know of no conviction for sale of narcotics that has been sustained when the narcotics sold were supplied by an agent of the government. This is more than mere inducement. In reality the government is supplying the sine qua non of the offense."

We too are sympathetic to the problems of government agencies seeking to enforce our narcotics laws. But it is also our duty to closely scrutinize police conduct to insure that the individual defendant's rights are not violated and that decency is not sacrificed in the administration of justice. See concurring opinion of Mr. Justice Roberts in Sorrells v. United States, supra, and concurring opinion by Mr. Justice Frankfurter in Sherman v. United States, supra.

With this general background before us, we must decide whether the criminal intent in this case arose in Hatch's mind or whether, as defendant contends, he was merely the innocent dupe of an informer who was asked to supply the government agent with a seller.

■■ Defendant's principal reliance is upon the fact that he and Spurlark were friends of long standing and knew each other to be addicts. Defendant maintains that it was only the inducement of his friendship for Spurlark which motivated the sale. Even were this the case, it has been held that appeals to sympathy and friendship are not sufficient to establish the defense of entrapment. People v. Lewis, 26 Ill2d 542, 187 NE2d 700; People v. Hall, 25 Ill2d 297, 185 NE2d 143, cert den, 374 US 849.

Defendant further urges that entrapment was established as a matter of law in that he was called on to make a sale of narcotics although the govern-

ment had no prior suspicion of him and, indeed, even knew his source of supply. This contention is also unavailing, for as was stated in People v. Wells, 25 Ill2d 146, at page 149, 182 NE2d 689:

". . . we know of no case that requires a prior knowledge of the criminal predilection in order to permit the police to afford an opportunity to commit a crime. The crux of the issue is not the reasonableness of the suspicion by the police, but the methods used."

Likewise, the contention that the government in effect provided the sine qua non of the offense in permitting defendant's known source of supply to remain at large is not convincing. The sine qua non rationale, as discussed above, was recognized in People v. Strong, supra, where the informer actually supplied the defendant with the narcotics which constituted the offense. The case at bar is clearly not analogous in that a mere opportunity to commit the crime was furnished the defendant.

■■ Defendant's argument that the evidence does not disclose a predisposition to sell narcotics is primarily based on three contentions. First, he alleges that he was merely a naive addict tricked into making the sale by his friend and fellow addict after a ninety minute automobile ride. Secondly, that there was no profit motive involved.* And finally, that he steadfastly refused to make further sales although urged to do so by Spurlark. These factors were argued before the trial judge who undoubtedly considered them for what they were worth. On the evidence he could find, without transgressing the bounds of reason, that the defendant, who had previously been convicted of possession of narcotics, was predisposed to make the sale.

---

* The evidence shows that defendant did eventually accept five dollars from either Spurlark or Wimpey for arranging the sale.

The mere existence of conflicting testimony or alternative explanations of conduct are not incompatible with proving a defendant guilty beyond a reasonable doubt. As was stated in People v. Owens, 23 Ill2d 534, 538, 179 NE2d 630, cert den, 370 US 947:

> "The trier of the fact is 'not required to search out a series of potential explanations compatible with innocence and elevate them to the status of a reasonable doubt.' (People v. Sullivan, 22 Ill 2d 122, 124; People v. Russell, 17 Ill2d 328)."

▮▮ Furthermore, in regard to defendant's contention that the testimony of Agent Wimpey was contradictory and thus unworthy of belief, this court recently stated: "In a bench trial of a criminal case the trial court's judgment based upon the credibility of the witnesses will not be discussed unless it is based on clearly unsatisfactory and improbable evidence." People v. Johnson, 47 Ill App2d 441, 198 NE2d 173; People v. Washington, 27 Ill2d 104, 187 NE2d 739. Viewing the record as a whole, it does not appear that Agent Wimpey's testimony was so unsatisfactory and improbable as to justify our interference with the trial court's judgment as to his credibility.

▮ Nor must we draw any adverse inferences from the agent's two month delay in making the arrest. In view of the nature of the narcotics traffic, such a delay was not unwarranted. People v. Guido, 25 Ill2d 204, 210, 184 NE2d 858.

▮ Defendant's "theory of the case" initially informs us that even if we do not view any of defendant's single points as sufficient evidence to sustain a defense of entrapment, all of the circumstances here taken together must lead one to conclude that defendant was not predisposed to commit the crime of which he was convicted. We do not agree.

Although, as we stated earlier, we believe that the courts must closely scrutinize the evidence in cases

187

where entrapment is pleaded with a view to protecting the rights of the defendant and discouraging abuses of power by the police, several factors in the record at bar convince us that defendant was not entrapped.

First among these is the amount of the sale in question. This was no petty "fix" amounting to only a few dollars. Rather it was a sale of a full ounce of heroin for a price of $140. The agent testified that he told defendant that it was "strictly business." As the trial court stated in denying defendant's post-trial motion:

> "If this was a five dollar or ten dollar sale, where the State comes in and asks to have a defendant found guilty of selling, it would be different. But here is a large scale. This is a $140.00 sale. It may be that this man was a distributor. I don't know, maybe he was a distributor to other people. There isn't any evidence of any other sales. (Ab 35.)"

Defendant's claim of entrapment is refuted by the fact that he had almost immediate access to so large a quantity of narcotics and by the further fact that he could obtain $140 worth of heroin on credit from a supplier. We believe this indicates that he was "wise in the ways of narcotics traffic." People v. Hall, 25 Ill2d 297, 300, 185 NE2d 143, cert den, 374 US 849. Defendant's ready compliance * with the agent's request for this large a quantity of heroin is

---

* According to the agent's testimony, defendant readily acquiesced when the agent said, "Sonny tells me you can do me so [sic] good." However, even under defendant's version of the meeting he merely said that he was not certain whether he could get the stuff, but that he would try. At no time did he deny that he had access to narcotics, nor did he at any time say that he was not a seller. Instead the evidence shows that defendant, from his first meeting with the agent, was set on making a sale.

188

not, as defendant urges, necessarily indicative of his naivete. It may rather indicate that defendant was not in the least disturbed by the quantity involved but instead exhibited an "instant willingness" to make a sale. People v. Gonzales, 25 Ill2d 235, 239, 184 NE2d 833, cert den, 372 US 923; People v. Toler, 26 Ill2d 100, 185 NE2d 874, cert den, 374 US 813. As stated above, we are not required to search for potential explanations compatible with defendant's innocence. People v. Owens, supra.

 We believe that defendant was proven guilty beyond a reasonable doubt of the crime of selling narcotics and the judgment of the Criminal Court of Cook County is therefore affirmed. Moreover, the minimum sentence of ten years to ten years and one day which defendant urges is too harsh for a first offender was sustained against charges of unconstitutional severity in People v. Gonzales, supra.

Affirmed.

ENGLISH, P. J. and McCORMICK, J., concur.