THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* GARY GULLEY, Defendant-Appellant.

Fifth District No. 75-125

Opinion filed March 12, 1976.

578

G. J. MORAN, J., dissenting.

Theodore Van Winkle, of McLeansboro, for appellant.

Robert H. Howerton, State's Attorney, of Marion (Bruce D. Irish and Raymond F. Buckley, Jr., both of Illinois State's Attorneys Association, of counsel), for the People.

Mr. JUSTICE JONES delivered the opinion of the court:

Defendant, Gary Gulley, was convicted in a jury trial of the crime of unlawful delivery of a substance containing less than 200 grams of methedrine, in violation of section 401(c) of the Controlled Substances Act (Ill. Rev. Stat., ch. 56½, par. 1401(c)). He was sentenced to one to ten years' imprisonment. Defendant appeals from the judgment of conviction and raises three issues: (1) whether the evidence was sufficient to prove defendant guilty beyond a reasonable doubt; (2) whether the defendant was entrapped; and (3) whether the court erred in sustaining objections to certain questions propounded by defense counsel on cross-examination of a witness for the State and in otherwise limiting cross-examination of that witness.

At trial defendant raised the affirmative defense of entrapment and most of the evidence presented by the State and by the defendant at trial was focused on that issue. The entrapment issue was submitted to the jury after proper instruction by the court. Although several witnesses testified during defendant's trial, the most important testimony for the purposes of this appeal was that of Jack Cantrell, a paid informer for the Illinois Bureau of Investigation, and that of the defendant. Accordingly, their testimony will be summarized here.

The testimony of Jack Cantrel was as follows. On March 19, 1973, Cantrell was at Fuzzy's poolroom in Harrisburg, Illinois. The defendant was also present at the poolroom and initiated a conversation with Cantrell in which the defendant told Cantrell that he knew where some "good speed" was located. Cantrell responded that he would like to buy

some. The defendant asked what quantity Cantrell wished to buy, to which Cantrell responded by asking about the price of the drug. The defendant told Cantrell that the drug would cost Cantrell $110 per ounce. The next day, March 20, 1973, at 1:15 p.m., Cantrell met with Sheriff Glenn Oglesby, Detective Jack Nolen, and I.B.I. agent Dennis Bowman in Harrisburg, Illinois. Agent Bowman and Sheriff Oglesby searched Cantrell and determined that no drugs were in his possession. Bowman then gave Cantrell $115, and Cantrell immediately thereafter proceeded to Fuzzy's poolroom where he encountered the defendant behind the poolroom at approximately 1:30 p.m. The defendant asked Cantrell whether he had the money to make the drug purchase, and Cantrell acknowledged that he did. They then got into the defendant's automobile and the defendant proceeded to drive to Carterville, Illinois (approximately 25 miles from Harrisburg). During the trip to Carterville the defendant told Cantrell that he would let Cantrell out at Cooch's poolroom in Carterville, where Cantrell was to wait while the defendant went to the home of Thomas Behnke to obtain the drugs. The defendant let Cantrell out as planned, and Cantrell did not see the defendant again until approximately 5 p.m. During all of that time Cantrell waited for Gulley at Cooch's poolroom with the exception of a brief period around 3 p.m. when Cantrell went to talk with Agent Bowman to explain the delay. (Agent Bowman was parked in his automobile behind the poolroom.) At no time during this period of waiting did Cantrell have drugs in his possession.

At approximately 5 p.m. defendant entered Cooch's poolroom, walked to a bench where Cantrell was seated, sat down, and told Cantrell that he had the deal arranged. The defendant told Cantrell that to get the drugs he would have to go into the poolhall bathroom, pick up the drugs and leave the money behind a pipe. Before Cantrell went into the bathroom, however, the defendant nodded to a man who was playing pool, after which the man went into the bathroom for approximately two minutes and then came out. Cantrell then went into the bathroom, picked up the narcotics and put them into his coat pocket, and placed $110 behind the pipe. (The drugs were later found to be methedrine.)

Cantrell and the defendant immediately thereafter left Cooch's poolroom and the defendant drove Cantrell back to Harrisburg where he let Cantrell out at the home of Cantrell's parents. Cantrell walked through the house and out the back door and met Agent John Sandusky. Cantrell gave Sandusky the drugs and the five dollars that he had not used for the purchase.

The defendant testified in his own behalf as follows. He had known Cantrell for eight years and had been an associate of Cantrell during

the first half of 1973. (Defendant's explanation of his association with Cantrell was that they smoked marijuana together and played ping pong in Cantrell's garage.) On March 19, 1973, defendant saw Cantrell at Fuzzy's poolroom. Cantrell approached defendant and asked the defendant to take him to Behnke's home in Carterville so that Cantrell could purchase some "crystal." Cantrell said that he needed the drug because he had been "up" for a week and was "coming down." Defendant replied that he did not want "to be messing with it" because he believed that he would soon be getting his job back. Cantrell then said, "oh, come on," and reminded defendant of the favors which he had done for him. Defendant then decided to take him to Behnke's. Cantrell stated that he "had" the money for the purchase. However, when defendant, knowing Cantrell was unemployed, asked Cantrell how he had obtained the money, Cantrell replied that he would get the money from his wife's welfare check which would come on March 20 or 21.

The next day, March 20, 1973, defendant met Cantrell at Fuzzy's poolroom. Cantrell said that his wife's check had arrived and that he had $115 and asked defendant to take him to Carterville to get some "crystal." Cantrell said that he needed the drug because he had been "up" for a week, that he had been at Behnke's for a week "doing crystal," and that he was "coming down." They went to the defendant's car and the defendant said that he would take Cantrell to Behnke's. They got into the car and started to Carterville.

During the trip to Carterville defendant asked Cantrell about some rumors which defendant had heard that Cantrell was "working for the police." Cantrell denied that he was working for the police and explained that the police would not have someone with the criminal background that Cantrell had in their employ. A little later during the trip Cantrell stated that he wanted the defendant to obtain the drugs for him because Cantrell owed Behnke $80 or $90 for "crystal" which Cantrell had "fired up" at Behnke's. Cantrell explained that if he went to Behnke's he would have to pay the debt and would then not have enough money to make the purchase. Defendant initially replied that he could not make the purchase, but when Cantrell reminded him of the favors Cantrell had done for him, defendant agreed to make the purchase.

Cantrell suggested that he would wait at Cooch's poolroom while the defendant went to obtain the drugs, and Cantrell also suggested that defendant go to the house of a person named Vineyard, where Behnke was likely to be. Defendant went to Vineyard's house, did not find Behnke there, and then went to Behnke's house.

When defendant arrived at Behnke's he told them what he wanted. He was asked whether he had the money and was told to sit and wait. Defendant gave "them" $115 and waited for two hours or longer. Finally they brought in the "crystal," weighed it, and gave it to defendant. He put it in his pants pocket and returned to Cooch's poolroom.

As defendant entered the poolroom he saw Cantrell sitting alone at the bar. Defendant sat beside Cantrell, told him that he had obtained the "crystal" and said "let's go." As they were walking to the door of the bar defendant handed Cantrell the drugs. Defendant then drove Cantrell to the home of Cantrell's parents in Harrisburg. Two months later defendant was arrested for the instant offense.

On this appeal defendant asserts that the State failed to prove beyond a reasonable doubt that defendant delivered a controlled substance to Jack Cantrell. Defendant asserts that only the testimony of Cantrell implicated the defendant. Defendant further asserts that, since Cantrell was impeached in a number of respects and since the testimony of several witnesses showed Cantrell to be a narcotics addict, the testimony of Cantrell was not sufficient to sustain a conviction. Defendant cites *People v. Bazemore*, 25 Ill. 2d 74, 182 N.E.2d 649, and *People v. Hamby*, 6 Ill. 2d 559, 129 N.E.2d 746, in support of this contention. Neither of these cases is controlling here, for neither case involved either an express admission by the defendant of the acts constituting the offense or an assertion of the defense of entrapment.

■■ In the instant case the defendant, testifying in his own behalf, expressly admitted obtaining the methedrine and delivering it to Cantrell. Thus the proof of defendant's guilt did not rest alone on the testimony of Cantrell and was more than sufficient to support the conviction. Moreover, in the instant case the defendant, unlike the defendants in *Bazemore* and *Hamby*, raised the affirmative defense of entrapment. Although a few courts have held that a defendant may be allowed to assert an entrapment defense *without being required to concede that he committed the crime charged or any of its elements* (see, for example, *United States v. Demma* (9th Cir. 1975), 523 F.2d 981; *People v. Perez* (1965), 62 Cal. 2d 769, 401 P.2d 934, 44 Cal. Rptr. 326), the generally accepted rule in Illinois and other jurisdictions is that the defense of entrapment is only available to a defendant who admits committing the acts which constitute the crime for which he is claiming entrapment. *People v. Fleming*, 50 Ill. 2d 141, 277 N.E.2d 872; *People v. Washington*, 81 Ill. App. 2d 162, 225 N.E.2d 673, *cert. denied*, 390 U.S. 991, 19 L. Ed.2d 1298, 88 S. Ct. 1190; *People v. Nahas*, 9 Ill. App. 3d 570, 292 N.E. 2d 466; *People v. Cooper*, 17 Ill. App. 3d 934, 308 N.E.2d 815; *People v.*

*Gaines*, 26 Ill. App. 3d 1059, 325 N.E.2d 679 (abstract opinion); Annot., 61 A.L.R. 2d 677 (1958) (see cases from various jurisdictions compiled in main volume and "Later Case Service" (1967)).

The defendant's argument on this first issue is very much like the argument made by the defendant in *Washington*. In that case the defendant contended that there was insufficient proof of guilt because there was no evidence in the record that the package transferred by the defendant to a paid police informer contained narcotics. The court on appeal rejected this argument, stating:

> "As an experienced defense lawyer, counsel was doubtless aware of a line of decisions establishing the rule that the defense of entrapment is incompatible with a claim that the defendant did not commit the acts constituting the offense charged in the indictment. [Citations.] The defense of entrapment, which was the only defense interposed at the trial of this case, loses all its meaning unless it is bottomed on admission of the acts charged. A defendant must be considered as having admitted commission of the acts involved in the offense charged when he invokes the defense of entrapment." 81 Ill. App. 2d 162, 173, 225 N.E.2d 673, 678.

The more important question in the instant case is whether entrapment existed as a matter of law; for whether entrapment exists is ordinarily a question for determination by the jury, under proper instruction, which determination should not be disturbed on appeal unless the reviewing court concludes that entrapment existed as a matter of law. *People v. Abbott*, 110 Ill. App. 2d 462, 249 N.E.2d 675, *cert. denied*, 398 U.S. 940, 26 L. Ed. 2d 275, 90 S. Ct. 1851; *People v. Nahas*; *People v. Cooper*; *People v. Kadlec*, 21 Ill. App. 3d 289, 313 N.E.2d 522.

The law of entrapment in this country has divided into two distinct formulations. The first is the "subjective" or "origin of intent" formulation. This is the more widely accepted formulation of the two (see Annot., 62 A.L.R. 3d 110, §§2(a) and 3(1975)) and has been the formulation continuously recognized by the majority of the United States Supreme Court. (See *Sorrells v. United States*, 287 U.S. 435, 77 L. Ed. 413, 53 S. Ct. 210; *Sherman v. United States*, 356 U.S. 369, 2 L. Ed. 2d 848, 78 S. Ct. 819; *United States v. Russell*, 411 U.S. 423, 36 L. Ed. 2d 366, 93 S. Ct. 1637.) Under this test there are two factors to be considered in determining whether entrapment occurred: (1) whether the defendant was induced to commit the offense by a government official or someone working with a government official, and (2) whether the defendant was predisposed to commit the type of offense involved. (For

a representative statement of this formulation, see the Model Penal Code §2.10(1), at 13 (Tent. Draft No. 9, 1959).)

In explanation of this formulation, Mr. Chief Justice Warren explained:

> "[T]he fact that government agents 'merely afford opportunities or facilities for the commission of the offense does not' constitute entrapment. Entrapment occurs only when the criminal conduct was 'the product of the *creative* activity' of law-enforcement officials. * * * To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal." *Sherman v. United States*, 356 U.S. 369, 372-73, 2 L. Ed. 2d 848, 851, 78, S. Ct. 819.

The second formulation is the "objective" formulation. Although not as widely accepted, it is the test continuously espoused by a minority of the Supreme Court of the United States. (See *Sorrells v. United States*, opinion of Mr. Justice Roberts concurring in part, dissenting in part; *Sherman v. United States*, opinion of Mr. Justice Frankfurter, concurring in result; *United States v. Russell*, dissenting opinions of Mr. Justice Douglas and Mr. Justice Stewart.) It is also the formulation adopted in Iowa (*State v. Mullen* (Iowa 1974), 216 N.W.2d 375), Michigan (*People v. Turner* (1973), 390 Mich. 7, 210 N.W.2d 336), and New Mexico (*State v. Sainz* (1972), 84 N.M. 259, 501 P.2d 1247). Under this test the predisposition of the defendant is irrelevant; the only factor to be considered is whether "the police conduct revealed in the particular case falls below standards, to which common feelings respond, for the proper use of governmental power." *Sherman v. United States*, opinion of Mr. Justice Frankfurter, 356 U.S. 369, 382, 2 L. Ed. 2d 848, 856, 78 S. Ct. 819.

The distinction between the two formulations is set forth in Model Penal Code §210, Comment 3, at 19 (Tent. Draft No. 9, 1959):

> "The main issue between the two formulations can be put by considering two examples. Under the [subjective test], if A, an informer makes overreaching appeals to compassion and friendship and thus moves D to sell narcotics, D has no defense if he is predisposed to narcotics peddling. Under the [objective test] a defense would be established because the police conduct, not D's predisposition, determines the issue. Under the [subjective test], A's mere offer to purchase narcotics from D may give rise to the defense provided D is not predisposed to sell. A contrary result is reached under the [objective test]. A mere offer to buy hardly creates a serious risk of offending by the innocent."

Illinois, by statute and by case law, has adopted the "subjective" formulation of the law of entrapment. (Ill. Rev. Stat., ch. 38, §7—12; *People v. Outten*, 13 Ill. 2d 21, 147 N.E.2d 284; *People v. Lewis*, 26 Ill. 2d 542, 187 N.E.2d 700.)

> "Entrapment has been defined as 'the conception and planning of an offense by an officer, and his procurement of its commission by one who would not have perpetrated it except for the trickery, persuasion, or fraud of the officer.' [Citation.] However, there is no entrapment where the law enforcement officer merely provides an opportunity for the commission of a crime by one who is already so predisposed. [Citation.] The distinction that must be drawn is between the inducement of an otherwise innocent person and the apprehension through lawful artifice of an individual already engaged in criminal activity. [Citation.] In making this determination the court should consider not only the conduct of the law enforcement officials, but also that of the defendant, including evidence regarding his predisposition to commit the crime involved." *People v. Lewis*, 26 Ill. 2d 542, 545-46, 187 N.E.2d 700, 701.

Several factors need be considered with respect to the entrapment issue in the instant case. First are several controverted matters. If the defendant's version of the transaction is believed, Cantrell initiated the transaction by asking the defendant to get him drugs, and the defendant then made the drug purchase and delivery, at no profit to himself, only after his initial reluctance was overcome by Cantrell's appeals to sympathy and friendship and reminders of the many favors Cantrell had done for the defendant. On the other hand, if Cantrell's version is believed, the defendant initiated the transaction by telling Cantrell that he knew where some methedrine could be obtained at a cost of $110 per ounce to Cantrell, and the defendant then obtained the drugs, after no begging by Cantrell, and delivered them to Cantrell through a scheme by which Cantrell at no time saw the drugs in defendant's possession.

Additionally, several uncontroverted matters merit consideration. On the one hand is the fact that the State did not show at trial that defendant had a prior record of drug involvement and the fact that defendant did not have the drugs at hand but had to travel to another town and wait two to three hours for the drugs at the home of the supplier. On the other hand are the facts that defendant's own testimony showed that he was a user of marijuana (although not of other drugs), that he had been present on several occasions when others were using hard drugs; and that he was familar with the language of illegal drug traffic,

with the manner in which drugs were used, and with the locations where they could be obtained.

In analyzing the instant entrapment issue we note that several Illinois cases have dealt with the same, or similar, factors as those involved herein.

In *People v. Toler*, 26 Ill. 2d 100, 185 N.E.2d 874, *cert. denied*, 374 U.S. 813, 10 L. Ed. 2d 1036, 83 S. Ct. 1705, the defendant had testified that he had purchased narcotics and sold them without profit to himself and only to aid a sick narcotics addict. The Supreme Court described the testimony of the defendant as painting a picture of an innocent man who finally succumbed to the appeals to his sympathy by an undercover police officer after the defendant had been approached some 20 times on behalf of the officer by a former employee of the defendant. The Supreme Court held that the defendant did not have a valid claim of entrapment and also pointed out:

> "The record also shows a circumstance hardly compatible with naivete and innocence, an elaborate system of delivery devised by defendant whereby the narcotics were never actually seen in his possession." 26 Ill. 2d 100, 102, 185 N.E.2d 874, 876.

In *People v. Hatch*, 49 Ill. App. 2d 177, 199 N.E.2d 81, the defendant asserted several arguments in support of his contention that entrapment had occurred. One argument was that his sale of narcotics to a paid informer was induced only because he and the informer had been friends of long standing and knew each other to be addicts. The court (citing *People v. Lewis* and *People v. Hall*, 25 Ill. 2d 297, 185 N.E.2d 143, *cert. denied*, 374 U.S. 849, 10 L. Ed. 2d 1069, 83 S. Ct. 1912) rejected this argument on the basis that appeals to sympathy and friendship are not sufficient to establish the defense of entrapment. The defendant also argued that the evidence did not show him to have a predisposition to sell narcotics. In support of this argument the defendant asserted that he was merely a naive addict tricked into breaking the law by a friend and fellow addict after a 90-minute car ride, that he had not been motivated by a desire to make a profit, and that he had refused to make further sales although urged to do so by the informer. The court also rejected these arguments, stating:

> "These factors were argued before the trial judge who undoubtedly considered them for what they were worth. On the evidence he would find, without transgressing the bounds of reason, that the defendant, who had previously been convicted of possession of narcotics, was predisposed to make the sale. The mere existence of conflicting testimony or alternative explanations of conduct are not incompatible with proving a defendant guilty beyond a rea-

sonable doubt." (49 Ill. App. 2d 177, 186-87, 199 N.E.2d 81, 86.) Finally, the court also refused to give any significance to the fact that the arrest of the defendant had not occurred until two months after the sale.

In *People v. Gassaway*, 65 Ill. App. 2d 244, 212 N.E.2d 689, the defendant claimed that his case was factually similar to the facts of *Sherman v. United States*. The court in Gassaway however, held that the facts in the two cases were easily distinguishable. In *Sherman* there had been a series of requests by the informer to the defendant for narcotics over a period of four months, during which the informer had repeatedly told the defendant that he was suffering and in need of drugs. In *Gassaway*, on the other hand, the record did not show persistent requests supported by tales of sympathy, but rather showed only two requests within the span of a few seconds. The court in *Gassaway* stated that the trial court had had a full opportunity to determine the credibility of the witnesses and chose to believe the witness for the State on the entrapment issue instead of the defendant, and the court refused to disturb the finding of the trial court.

In *Gassaway* the defendant also asserted that his lack of prior record and the lack of any testimony tending to show that the defendant had a prior record was a significant factor in establishing the defense of entrapment. The court, citing *People v. Wells*, 25 Ill. 2d 146, 182 N.E.2d 689, rejected this argument by pointing out that although the absence of a prior record may be relevant, the State does not have the burden of proving that the defendant has a prior record.

In *People v. Washington*, the defendant made several arguments in an attempt to show that entrapment had occurred. His first argument was that his testimony at trial showed that at least an hour and a half had elapsed between the time he was asked to procure narcotics and the time he was able to procure them. The court held that when viewed in relation to the secretive nature of the narcotics trade, the delay was sufficiently short to show a ready willingness on the defendant's part and a ready access to unlawful narcotics. The defendant also argued that the facts showed that he had been reluctant to enter into narcotics transaction and that he had only obtained the drugs because of his friendship with the informer. He further urged that there was no evidence that he had previously been involved with narcotics and that his only prior criminal record was a conviction for assault with a deadly weapon. The court, however, held that neither an initial or temporary reluctance to enter a narcotics transaction nor the defendant's past history, though relevant on an entrapment issue, are determinative, and

that an appeal to friendship does not establish entrapment as a matter of law.

In *People v. Abbott*, the defendant had testified that he had not decided to make a sale of narcotics until his resistence broke after a prolonged series of persistent requests and appeals to sympathy by the informer. The informer, however, testified that he had neither begged the defendant nor pretended to be sick. The court on appeal refused to find as a matter of law that entrapment had occurred, holding that the issue was a matter of credibility which the jury had determined adversely to the defendant.

■■ Whether entrapment occurred in the instant case similarly presented an issue of the credibility of the witnesses. Cantrell's version of the events, if believed, was sufficient to show beyond a reasonable doubt that entrapment had not occurred. The jury elected to believe Cantrell. Defendant's own admission at trial showed that he was not a mere naive innocent, but rather was wise in the ways of drug traffic. In light of this fact we cannot say that the jury's determination was wrong and that entrapment existed as a matter of law.

Defendant's last contention is that the trial court erred in sustaining objections to seven separate questions which defense counsel sought to have answered by Cantrell on cross-examination and in limiting the scope of the cross-examination of Cantrell in three specific respects. The seven questions which defense counsel sought to have answered by Cantrell were:

1. "What promises did the State's Attorney, Mike Henshaw, of Saline County, Illinois, make to you if you would become an I.B.I. informant?"
2. "What criminal cases were to be dropped or dismissed if you would become an I.B.I. informant?"
3. "Were any cases dropped or dismissed after you became an I.B.I. informant by the State's Attorney of Saline County?"
4. "Were you incarcerated in the jail of Saline County at the time you became an I.B.I. informant?"
5. "Who made the initial contact for you to become an informer for the I.B.I., yourself or the State's Attorney?"
6. "Were you ever a parole violator?"
7. "Had you contacted Agent Bowman prior to this time for the purpose of informing him of buys?"

Of these seven questions, all but number 6 were propounded and discussed out of the presence of the jury before being asked of Cantrell in the presence of the jury. The court limited numbers 1, 2, 3, 5, and 7, in

that they could not be asked in general, but only with respect to Cantrell's involvement with defendant. Defense counsel accepted the rulings without comment, making no statement to the court regarding what relevant matters, if any, might be brought out if the questions were not so limited. The questions, as restricted, were asked of Cantrell and answered. Furthermore, defendant was allowed much latitude, in other aspects of the trial, in presenting evidence to impeach Cantrell.

■■ The scope of cross-examination is a matter resting within the sound discretion of the trial court and its ruling should not be disturbed on review unless a clear abuse of discretion is shown. (*People v. Nicholls*, 42 Ill. 2d 91, 245 N.E.2d 771, *cert. denied*, 396 U.S. 1016, 24 L. Ed. 2d 507, 90 S. Ct. 578; *People ex rel. Walker v. Pate*, 53 Ill. 2d 485, 292 N.E.2d 387.) In view of the fact that defense counsel acquiesced in the rulings on questions 1, 2, 3, 5, and 7, and offered no reasons for allowing the questions to be asked without restriction, we find no abuse of discretion. *People v. Langzem*, 307 Ill. 56, 138 N.E. 222; *People v. Caldwell*, 62 Ill. App. 2d 279, 210 N.E.2d 556; *People v. Curtis*, 123 Ill. App. 2d 384, 259 N.E.2d 397; *People v. Porter*, 29 Ill. App. 3d 456, 330 N.E.2d 599.

Question number 4 was propounded by defense counsel out of the presence of the jury and the State's Attorney objected, giving his reasons upon which he based his objection. Defense counsel made no comment with respect to the question, nor did he comment when the court sustained the objection. However, defense counsel, despite the ruling, asked the question of Cantrell in the presence of the jury, and Cantrell responded in the negative. In light of this, we fail to see how defendant was prejudiced by the court's prior ruling with respect to this question.

■■ Question number 6 was asked of Cantrell in the presence of the jury and Cantrell responded that he had been a parole violator. The State's Attorney then objected, and the court instructed the jury to disregard the answer. Since the question was asked and answered in the presence of the jury and in view of the general rule that only prior convictions for infamous crimes can be used to impeach a witness on the basis of his past criminal activity, we fail to see how the defendant was prejudiced by the court's ruling.

■■ Defendant contends that the trial court erred in refusing to let defense counsel cross-examine Cantrell on anything which occurred between the time Cantrell became an informant for the I.B.I. and March 19, 1973. Cantrell testified that he had not been instructed to try to make a purchase from defendant or any other person; that, although he had made various drug purchases for which he had been paid by the I.B.I., none of the purchases had been planned by the I.B.I.;

that he had not been given the name of defendant by the I.B.I.; and that the I.B.I. had no knowledge of a possible purchase by Cantrell from Gulley until Cantrell contacted Agent Bowman on March 19 subsequent to defendant's offer to sell drugs to Cantrell. Defense counsel offered no evidence to rebut this testimony nor did he offer a sufficient reason for the court to determine that Cantrell's activity prior to March 19 was relevant to the entrapment defense at issue. We, therefore, find no error in the court's limitation of the cross-examination of Cantrell to events which occurred on or after March 19, 1973.

Defendant also asserts that the court erred in sustaining the State's objection to defense counsel's asking Cantrell whether he had given any drugs away between the time he became an informant and March 19. Defense counsel asked this question of Cantrell out of the presence of the jury, and Cantrell responded that he had not given away drugs during that period of time. Defense counsel presented no evidence controverting Cantrell's denial. We find no error in the court's ruling.

Finally, defendant contends that the court erred in sustaining the State's objection to defense counsel's presenting evidence of Cantrell's reputation in the community as a narcotics user. Defendant's argument is without merit. Defendant himself and at least four other witnesses testified in the presence of the jury regarding Cantrell's use of narcotics. We find no reversible error in the court's ruling that defense counsel could not present evidence of Cantrell's reputation in the community as a narcotics user.

For the foregoing reasons, the judgment is affirmed.

Affirmed.

CARTER, J., concurs.

Mr. JUSTICE GEORGE J. MORAN, dissenting:

I dissent from the decision reached by the majority of the court which, in my opinion, is founded upon errors of law and a refusal to take account of facts which are important to Gulley's defense.

The principal error rests in the majority's assertion that a jury's finding of no entrapment can be reversed only if there were entrapment as a matter of law. Four cases are cited for the proposition: *People v. Kadlec*, 21 Ill. App. 3d 289, 313 N.E.2d 522; *People v. Cooper*, 17 Ill. App. 3d 934, 308 N.E.2d 815; *People v. Nahas*, 9 Ill. App. 3d 570, 292 N.E.2d 466, and *People v. Abbott*, 110 Ill. App. 2d 462, 249 N.E.2d 675.

Of these cases, only *People v. Nahas* suggests such a rule. The opinion in *People v. Nahas* is wrong. No other Illinois decision contains a

similar statement. On the contrary, the Illinois Supreme Court said in *People v. Dollen*, 53 Ill. 2d 280, 290 N.E.2d 879, that entrapment is an affirmative defense within the meaning of section 3—2 of the Criminal Code (Ill. Rev. Stat. 1975, ch. 38, par. 3—2) which the prosecution must prove to be false beyond a reasonable doubt after the defendant offers evidence of entrapment. As with other affirmative defenses, if the evidence introduced at trial permits a reasonable doubt concerning the existence of entrapment, the jury's verdict of guilty must be reversed. *People v. Anderson*, 30 Ill. 2d 413, 197 N.E.2d 24; *People v. Adams*, 113 Ill. App. 2d 205, 252 N.E.2d 35.

By saying that a reversal is in order only if there were entrapment as a matter of law, the majority has placed a serious misconception at the center of its reasoning. This, I believe, negates all else that the majority says in its opinion.

Did the evidence in this case justify a reasonable doubt on the issue of Gulley's entrapment by the State's informer?

The defendant, Gulley, and the informer, Jack Cantrell, related different versions of their encounter. The differences in their testimony are important because the answer to the question whether Gulley was entrapped depends on whose testimony is believed. The jury apparently believed Cantrell, whose testimony indicated that Gulley was not entrapped. Although a jury's decision on the credibility of witnesses ordinarily will not be disturbed, an appellate court may reverse a conviction on the ground that an essential witness for the prosecution was not credible. (See *People v. Bazemore*, 25 Ill. 2d 74, 182 N.E.2d 649.) Thus it is permissible to evaluate Cantrell's credibility.

Cantrell was unworthy of belief. His casual willingness to lie from the witness stand was demonstrated by his response to the question whether he had ever used or been addicted to drugs. Cantrell stated that he had not used drugs and that he had not been addicted to drugs. The testimony of William Mitchell for the defense, however, was that Cantrell had used drugs continuously during his two week's stay at Mitchell's house in April, 1973. John Whitehead testified that he had seen Cantrell use a syringe to inject drugs into his vein. Richard Cooper said that he had seen Cantrell take cocaine. These witnesses showed, contrary to Cantrell's testimony, that Cantrell was a habitual drug user.

The evidence of Cantrell's habitual use of drugs was also significant for its tendency to show his lack of veracity. (*People v. Smith*, 38 Ill. 2d 237, 231 N.E.2d 185; *People v. Bazemore*; *People v. Hamby*, 6 Ill. 2d 559, 129 N.E.2d 746; *People v. Crump*, 5 Ill. 2d 251, 125 N.E.2d 615.) Moreover, Cantrell's role as an informer was enough to require scrutiny of his testimony because an informer, especially an addict informer, like

an accomplice, is considered to be susceptible to pressures from the law enforcement officials with whom he cooperates. *People v. Smith; People v. Hamby.*

Because Cantrell did not merit belief, Gulley's testimony alone remained as an explanation of what happened between Gulley and Cantrell. This testimony revealed that Cantrell initiated the conversation about drugs on March 19, 1973, in Fuzzy's Pool Room in Harrisburg, Illinois. Cantrell begged Gulley to take him to Carterville, Illinois, so that he could purchase a quantity of drugs. Cantrell did not suggest immediately that Gulley become involved in the purchase and delivery of the drugs. What Gulley agreed to do was to drive Cantrell to Carterville. Only when Gulley and Cantrell had traveled 25 miles from Harrisburg to Carterville on March 20, 1973, did Cantrell explain to Gulley that he wanted Gulley to purchase the drugs. Cantrell begged Gulley to go to the apartment of Thomas Behnke and to buy the drugs so that Cantrell would not have to pay any debts before making a purchase.

Thus Gulley's testimony established that Cantrell coaxed him step by step into making an unlawful delivery of a controlled substance. Cantrell overcame Gulley's hesitancy even to go to Carterville by falsely saying that he intended to buy the drugs himself, implying that Gulley would not be involved in the purchase or delivery of the drugs. It is important to note that by taking Cantrell to Carterville so that Cantrell could purchase drugs, Gulley committed no crime.

After Gulley had expended the effort necessary to drive himself and Cantrell 25 miles from Harrisburg to Carterville, Cantrell said for the first time that he could not buy the drugs and that Gulley had to buy the drugs for him at Behnke's apartment. With some pleading, Cantrell overcame Gulley's reluctance to make the purchase and delivery of the drugs. The likelihood seems great that if Cantrell had told Gulley in Harrisburg that he actually wanted Gulley to buy the drugs in Carterville, Gulley would have refused to become involved in Cantrell's scheme.

The mildest word that can be used to describe this step-by-step cajoling of a citizen to perform the elements of a crime, so that the citizen can later be prosecuted and jailed, is "reprehensible." It is permissible for a public officer or employee merely to afford an opportunity to an individual to commit an offense in furtherance of a criminal purpose which the individual has originated. (See Ill. Rev. Stat. 1975, ch. 38, par. 7—12.) But to stay within the bounds of what is permissible, the public officer or employee should present the opportunity in one piece; that is, the individual should be made aware, at an early moment in his dealing with the public officer or employee, of exactly what he is

being tempted to do. This is desirable so that the individual's ordinary strength of character will be as effective as possible in helping him resist the temptation that is laid before him. By presenting an opportunity to an individual in several pieces or steps, with the intention of minimizing his resistance to the temptation to commit an offense, a public officer or employee does much more than present an opportunity; he also attempts to destroy the individual's ability to reject the opportunity. When this happens, it cannot be said that a criminal purpose has originated in the mind of the individual. Rather, the criminal purpose in such cases arises in the mind of the public officer or employee, and this constitutes entrapment. See *People v. Wells*, 25 Ill. 2d 146, 148, 182 N.E.2d 689, 690; *People v. Steig*, 258 Ill. App. 447.

Because Gulley's testimony contained the only credible version of the encounter between him and Cantrell, and the testimony established that Cantrell coaxed Gulley step by step into committing the offense, the evidence in this case justified at least a reasonable doubt on the issue of entrapment. Gulley's conviction, therefore, should be reversed.

The record discloses that the defendant had been in trouble in the past, but had found a job and was in the process of rehabilitating himself when he was induced to commit a crime by his government. Thus his chances for becoming a useful citizen have been considerably lessened by an affirmative act of his government. This is a tragedy not only for him but also for the people.